**PIG IMPROVEMENT CO., INC., Plaintiff,**

v.

**MIDDLE STATES HOLDING CO. and Delmarva Farms Corp., Defendants.**

**Civil Action No. 94–599–SLR.**

United States District Court, D. Delaware.

Sept. 10, 1996.

John D. Balaguer, of White & Williams, Wilmington, DE (Thomas A. Allen, and Kimberly M. Dolan, of White & Williams, Philadelphia, and Charles T. Patterson, of Eidsmoe, Heidman, Redmond, Fredregill, Patterson & Schatz, Sioux City, IA, of counsel), for plaintiff.

Anthony G. Flynn, and Timothy Jay Houseal, of Young, Conaway, Stargatt & Taylor, Wilmington, DE (James P. Ulwick, and Kevin F. Arthur, of Kramon & Graham, P.A., Baltimore, MD, of counsel), for defendant.

## MEMORANDUM OPINION

SUE L. ROBINSON, District Judge.

## I. INTRODUCTION

This is a civil action between the citizens of different states, and the matter in controversy exceeds the sum of $50,000. Therefore, the court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

Before the court is a motion for summary judgment filed by plaintiff Pig Improvement Company, Inc. ("PIC") against defendants Middle States Holding Company, Inc. and Delmarva Farms Corporation (collectively "Delmarva") on Delmarva's amended counterclaim. (D.I. 58) PIC, the largest supplier of genetically improved breeding stock for the United States swine[1] industry, supplied breeding stock to Delmarva from 1988 to December 1992 and brought suit to collect $81,089 from Delmarva in breach of contract. Delmarva, which was the largest commercial hog producer in the State of Maryland during the years relevant to this litigation,[2] filed a counterclaim alleging breach of contract, breach of warranty, and various counts in negligence and in fraud. More specifically,

Delmarva claims that PIC is responsible for economic losses caused by the introduction of Porcine Reproductive and Respiratory Syndrome ("PRSS") into Delmarva's herd. For the reasons that follow, the motion will be granted in part and denied in part.

## II. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a summary judgment shall be entered in favor of a moving party where it appears "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories and admissions of file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. Where the nonmoving party opposing summary judgment has the burden of proof at trial on the issue for which summary judgment is sought, that party must then make a showing sufficient to establish the existence of an element essential to its case. If the nonmoving party fails to make a sufficient showing in this regard, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment "mirrors the standard for a directed verdict." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Therefore, the mere existence of some evidence in support of the nonmoving party will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-

---

1. For purposes of this motion, the words "swine," "hog," and "pig" will be used interchangeably. For purposes of edification, however, the court notes the different descriptions attributed to "omnivorous nonruminant mammal[s] of the family 'Suidae'." For example, "swine" is described as "a domestic hog;" "hog" is described as "a domesticated swine weighing more than 120 pounds raised for market;" "pig" is described as "a young swine of either sex weighing less than 120 pounds;"

"boar" is described as "the castrated male of swine;" and "gilt" is described as "a young female swine, especially one that has not produced a litter." The Random House Dictionary of the English Language College Edition (1968).

2. The record indicates that Delmarva's herd, when at 100% capacity, was close to 4,000 animals. (D.I. 65, B61)

moving party on that issue. *Id.* at 249, 106 S.Ct. at 2510–11. In making its determination, the court should view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor. *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir.1994).

To determine which state's law governs the controversy before it, a Delaware federal court sitting in diversity would apply Delaware choice-of-law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In both tort and contract actions, Delaware courts apply the "most significant relationship" test to determine which law applies to the dispute, assuming the laws of the probable jurisdictions in fact conflict with one another. *See, Oliver B. Cannon & Son, Inc. v. Dorr–Oliver, Inc.*, 394 A.2d 1160 (Del.Super.1978); *Travelers Indemnity Co. v. Lake*, 594 A.2d 38 (Del.Super.1991). Several states are implicated by this test, including Maryland, the location of Delmarva's hog farms and the place of delivery of the hogs; Kentucky, the location of PIC's headquarters and the point-of-origin of some shipments of breeding stock to Delmarva; Delaware, the location of Delmarva's headquarters and one of its farms; and Iowa, the state law chosen in PIC's conditions of sale.

A choice-of-law analysis is not required, however, where the laws of the affected jurisdictions do not conflict. *Lucker Mfg. v. Home Ins. Co.*, 23 F.3d 808, 813 (3d Cir. 1994); *Oil Shipping B.V. v. Sonmez Denizcilik Ve Ticaret A.S.*, 10 F.3d 1015 (3d Cir. 1993). Because all four jurisdictions noted above have adopted without modification the provision of the U.C.C. relevant to the dispute at bar,[3] the contract's choice-of-law (Iowa) is not in conflict with the law of the other affected jurisdictions. Therefore, the court has reviewed U.C.C. case law from all of the principal jurisdictions, as well as from other U.C.C. jurisdictions. (D.I. 59 at 13; D.I. 64 at 23 n. 3)

## III. FACTS

For purposes of this proceeding, the following facts, viewed in the light most favorable to Delmarva, are essentially undisputed.[4]

### A. The Business Relationship

From the commencement of their business relationship in 1988, PIC sent Delmarva breeding stock under written contracts signed by both parties. (D.I. 60 at A21–115) Gerald Klein, the sole shareholder of Middle States Holding Company and owner of Delmarva Farms Corporation, is an experienced attorney and businessman familiar with the Uniform Commercial Code. (D.I. 60 at A166–173) Klein testified in deposition that he neither questioned nor sought to negotiate a change in the forms used by PIC: "[I]f you want to buy breeding stock, you're basically using this paper work. But I did not undertake to renegotiate this document. Rather, I accepted it for purposes of these transactions." (D.I. 60 at A166–67, A114)

The terms of the PIC/Delmarva contract appear in a one-page document, front and back, on both the agreements of sale and the invoices. (D.I. 60 at A21–A115) The terms in dispute include the following language printed on the front, signature side of the agreement of sale: [5]

**III. DISCLAIMER OF WARRANTIES:** The terms and conditions of this Agreement contain all warranties made by PIC to the customer. NO OTHER WARRANTIES, EXPRESSED OR IMPLIED, OTHER THAN THOSE SET FORTH HEREIN, ARE GIVEN. ALL PIGS SOLD HEREIN ARE SOLD "AS IS", AND PIC SPECIFICALLY DISCLAIMS ANY WARRANTY OF MERCHANTA-

---

3. *See,* Del.Code Ann. tit. 6 §§ 1–101 to 2–725 (1993); Iowa Code Ann. § 554.1101 to 554.2725 (West 1995); Ky.Rev.Stat.Ann. §§ 355.1–101 to 355.2–725 (Michie/Bobbs–Merrill 1987); Md. Code Ann., Com.Law I §§ 1–101 to 2–725 (1992).

4. The court notes that the only facts recognized for purposes of this proceeding, however, are those supported by the record, as opposed to mere statements of counsel.

5. The agreement of sale executed By Delmarva for the 1992 deliveries (D.I. 60, A21–22, A28) is substantially the same in all relevant respects as those previously used by PIC and executed by Delmarva. (D.I. 60, A23–25, A29–36)

BILITY AND ANY WARRANTY OF FITNESS FOR ANY PARTICULAR PURPOSE. THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION ON THE FACE HEREOF.

**IV. Except for the credit provisions herein, PIC shall have no liability for losses resulting from communicable diseases, or from advice and information given by PIC, or for any consequential losses or other costs.**

Customer certifies that the Conditions of Sale printed on the back hereof have been read and agreed to as part of this agreement, the same as though they were printed above the signatures. Customer further acknowledges receipt of the recommendations on isolation and acclimatization of breeding stock.

(D.I. 60 at A21) (captions emphasized in original). The conditions of sale, printed on the back of the agreement of sale and of the invoices used after February 1992,[6] include the following language:

**WARRANTIES OF PIC:** PIC warrants that: **Pigs supplied herein have been inspected and certified in accordance with federal and state animal health regulations.** Pigs delivered (i) will have been owned by PIC for at least thirty (30) days or (ii) will have been owned by PIC for less than thirty (30) days but will have been acquired by PIC from a multiplier that is operated in accordance with standards established by PIC. . . .

**ISOLATION AND ACCLIMATIZATION:** For isolation, purchaser shall completely isolate all animals purchased in a clean facility, physically separate from other swine for at least 21 days, shall follow the recommendations of a licensed veterinarian for isolation and for release of the purchased animals after the isolation period, and shall not begin acclimatization procedures for 21 days after delivery. **Purchaser agrees and understands that PIC shall have no liability for replacement of**

**animals due to presence of economically significant infectious agents unless purchaser complies with this isolation procedure. . . .**

**CREDITS AND PROCEDURES:** In case of complaint, purchaser shall call or write to PIC. . . . **If the pig identified is determined to have been incapable of breeding after isolation and acclimatization, PIC will authorize slaughter following notification. A credit for the invoiced cost of the pig, less slaughter value, will be issued. . . .**

If the complaint is based on the presence of economically significant infectious agents in the animals, PIC will credit the invoiced cost of the animals less slaughter value, if the isolation procedures above have been followed and if purchaser's veterinarian provides PIC with evidence, satisfactory to PIC, of the existence of the agent, and if PIC receives from purchaser the notice and complaint required by the complaint process provided above, before the animals carrying the agent are removed from isolation.

**PIC shall issue credits only if the complaint is received within five months after delivery, and if the above procedures are followed. . . .**

**LIMITATION OF LIABILITY:** PIC shall have no liability for risk of loss of pigs delivered under the terms of this agreement after delivery, which shall be deemed complete immediately upon the arrival of the shipment at the purchaser's premises. **Except for the credit provision provided for above, PIC shall have no liability for losses resulting from communicable diseases** or for losses resulting or claimed to have resulted from advice and information given by PIC, whether in oral or written form. **PIC's liability shall be limited by the above terms, and PIC shall not be liable for any consequential losses, any veterinarian's fees, or any other costs incurred in**

---

6. Invoices used prior to February 1992 contained the following language printed on the back of the document: "Purchaser hereby acknowledges and agrees that the terms of and conditions of sale appearing in the AGREEMENT OF SALE are expressly made a part hereof and that no other warranties, express or implied, including implied warranties of merchantability and fitness for a particular purpose, are given." (D.I. 60, A26, A48–112)

any manner whatsoever after pigs are in purchaser's possession. . . .

**EXCLUSIVE REMEDIES:** Purchaser's remedies provided herein are exclusive remedies, and all other remedies, statutory or otherwise, are expressly waived by purchaser. **The purchaser is aware of the risks of swine production and therefore, waiver is neither unreasonable nor unconscionable.**

**DISCLAIMER:** These conditions of sale contain all warranties made by PIC to purchaser. NO OTHER WARRANTIES, EXPRESSED OR IMPLIED OTHER THAN THOSE SET FORTH HEREIN, ARE GIVEN. ALL PIGS SOLD HEREIN ARE SOLD "AS IS", AND PIC SPECIFICALLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY AND ANY WARRANTY OF FITNESS FOR ANY PARTICULAR PURPOSE. THERE ARE NO WARRANTIES WHICH EXTEND BEYOND THE DESCRIPTION OF THE FACE HEREOF.

(D.I. 60 at A22, A27–47) (captions emphasized in original). Delmarva took advantage of the credit provision on numerous occasions during the course of its business relationship with PIC and had never expressed any dissatisfaction with same. (D.I. 60 at A4–17, A164–65)

## B. PRRS

During the 1980's, a previously unrecognized disease syndrome, commonly labelled "mystery pig disease," was found to be causing production losses in pig herds in North America. In 1991, scientists isolated the virus that caused the disease. As described in a 1991 [7] article supplied by Delmarva,

[m]ystery pig disease (MPD) is a new, sometimes devastating infectious disease of swine that has been reported since 1987. . . . The major clinical signs of MPD include but are not limited to: abortions; stillborns; weak pigs; mummies; postfarrowing respiratory problems in piglets; . . . flu-like signs in the finishing phase. . . . Incidence of MPD is widespread and has been reported in at least 11 states in the continental United States and

two Canadian provinces. . . . There seems to be no predilection for any type of hog farm. Mystery pig disease has been observed in total confinement units, nonconfinement units, high health status farms as well as conventional health status farms. . . . **Since the etiology of MPD is unknown, no definitive confirmation on the method of disease spread can be given at this time. It has been speculated that rodents, wind, wildlife, pig-to-pig, and so forth could all be involved in the spread of MPD. . . .**

(D.I. 65 at B100–05) (emphasis added).

A test for the PRRS antibody to the virus was first available in 1992. From June through November 1992, PIC surveyed its breeding herds for the antibody to the PRRS virus by conducting serology tests on serum drawn from a **sampling** of pigs in each of its herds; three PIC herds were "closed" as a result of the testing. (D.I. 60 at A122–23, A191–92, A274; D.I. 65 at B75) Delmarva likewise administered a serological PRRS antibody test on five of its pigs on or about July 9, 1992, the results showing one animal of the five testing positive. (D.I. 60 at A214–19, A229)

In July 1992, PIC shipped Delmarva: (1) nine boars from Peck's Depot on or about July 10, 1992, two of which were rejected pursuant to the credit provision in the contract; (2) fifteen boars from Main Farm on or about July 10, 1992, two of which were rejected pursuant to the credit provision in the contract; and (3) 100 gilts from Cardinal Sow V on or about July 13, 1992, six of which were rejected pursuant to the credit provision in the contract. (D.I. 60 at A16–17) At the time of the July shipments, PIC had not received test results indicating that any animals in these three source herds tested serologically positive for the PRRS virus, and no rejections of PIC animals had anything to do with PRRS. (D.I. 60 at A119, A122)

In the fall of 1992, Delmarva employee Duane Fort heard that PIC breeding stock had tested positive to PRRS antibodies. (D.I. 60 at A197) In October 1992, Fort telephoned PIC salesman Joe Koenig with

---

7. The relevant state of knowledge is that of record from the 1991–92 time frame.

questions about PIC's PRRS status in October. (D.I. 60 at A127–130, A197–202(a)) Koenig told Fort that PIC had some farms that had tested positive for PRRS antibodies and that Fort should have Delmarva's veterinarian direct further questions to PIC's veterinarians. (D.I. 60 at A128) Subsequently, Koenig sent Fort a facsimile attaching recent articles about PRRS.[8] (D.I. 60 at A202(a)) The record indicates that Fort subsequently spoke about PRRS with two veterinarians, Dr. Armbrecht and Dr. Loula.[9] Fort testified at deposition that Dr. Armbrecht characterized the PRRS antibody serology test as "not that accurate," as it "is a fluorescent antibody test and it's subjective, rather than objective...." (D.I. 65 at B98) Fort recollected that "isolation was talked about, yes. Whether [Dr. Armbrecht] said it or I said it, I don't know." (D.I. 65 at B98) Fort could not recall whether Dr. Loula talked about isolation or not; he could not recall either one of them advising him to get Delmarva's herd serologically tested. (D.I. 65 at B98) Fort testified that he was not concerned about PRRS at Delmarva after speaking with these veterinarians and, therefore, did not pursue further information about PRRS from PIC directly; neither did Fort pursue further testing of Delmarva's herds. (D.I. 65 at B94–5)

After the Koenig/Fort conversation, Delmarva received its final two shipments of animals from PIC: (1) eighty gilts from Cardinal Sow V and twelve boars from Peck's Depot on or about November 16, 1992, none of which were rejected; and (2) 100 gilts on or about December 28, 1992 from Retreat Finisher, none of which were rejected. (D.I.

60 at A17) Test results from both Cardinal Sow and Retreat received by PIC in September 1992 showed animals from both herds with PRRS antibodies.[10] PIC did not inform Delmarva of this specific information; neither did Delmarva conduct any further serological testing of the PIC pigs during the isolation period. There is nothing in the record to indicate whether the animals shipped by PIC to Delmarva were negative or positive. None of the animals were visibly sick or displayed clinical signs of any disease during the isolation period. (D.I. 60 at A284, A326–27, A341–43)

There is no dispute that in 1992, very little was known about PRRS. Even the advent in 1992 of serological testing for PRRS antibodies did little to advance the state of knowledge as it related to herd management, because a positive result did not necessarily denote the presence of the PRRS virus or of any active disease process or identify the serial type of PRRS virus; a negative result did not necessarily mean the absence of an ability to spread the disease. (D.I. 60 at A189–90, A202(d)–(e), A210, A223, A273–276; D.I. 65 at B96)

Federal agricultural regulations require that animals shipped interstate be inspected at the point of origin by an accredited veterinarian and "found to be apparently free of hog cholera and other contagious infections, or communicable diseases." 9 C.F.R. § 76.12 (Schedule B) (1995). Veterinarians engaged in this certification procedure visually inspect animals for signs of disease. (D.I. 60 at A206–07) The federal certification procedure does not require PRRS testing; PRRS

---

8. Two 1992 articles forwarded to Fort included the following information: The new serologic tests did not necessarily detect all strains of the PRRS virus; herd management (i.e., overcrowding, poor sanitation and few breaks between age groups) played a role at least in treating the secondary disease processes associated with PRRS; having been exposed to the PRRS virus (i.e., having the antibodies to the PRRS virus, as evidenced by a positive result on the serologic test) was thought to make the animal immune; once a herd had tested positive for PRRS, one school of thought counselled the addition of only other positive animals, while negative animals should be added to negative herds; positive animals did not necessarily show recognizable symptoms. (D.I. 60 at A202(b)–(e))

9. Although Delmarva's counsel describes these veterinarians as representing PIC, the record does not support this contention, as Fort had previously consulted with them in apparently non-PIC positions and there is no direct information relating their respective positions, if any, at PIC. (D.I. 65 at B93–5)

10. More specifically, on September 9, 1992, 22 of 40 animals tested at Cardinal Sow V tested positive for PRRS antibodies; 27 of 30 animals tested at Retreat tested positive for PRRS antibodies. (D.I. 60 at A122–23)

has never been a reportable disease under federal law. (D.I. 60 at A209) Consequently, there is no federal legal impediment to veterinarians certifying livestock which originate from herds testing serologically positive for PRRS antibodies or for certifying livestock which have not been tested for PRRS at all. (D.I. 60 at A208–09)

PRRS is not and never has been a reportable disease in the regulatory sense in the State of Maryland. (D.I. 60 at A209, A339) The State of Maryland does not test and never has tested animals for PRRS. (D.I. 60 at A340) There is no evidence of record which indicates that, **in 1992,** a breeder with animals that tested serologically positive for PRRS antibodies was legally prohibited from selling them in the State of Maryland. (D.I. 65 at B91)

As of December 1992, Delmarva had information that at least one of its pigs had been exposed to PRRS and that PIC had pigs exposed to PRRS. Delmarva first notified PIC of its allegations of a PRRS infection in early 1994, over one year after the last delivery of PIC stock. Delmarva attributes its subsequent significant decline in production to a PRRS virus infection.

## IV. ANALYSIS

### A. Contract Claims

There is no dispute that the agreements of sale and invoices described above constituted a contract between PIC and Delmarva for the sale of porcine livestock. Neither is there any dispute that the Uniform Commercial Code ("U.C.C.") applies to the sale of

porcine livestock. U.C.C. § 2–105(1). The dispute arises over the enforcement of the contract terms. PIC argues in support of its motion for summary judgment that the contract at issue prospectively allocated risk and properly excluded all liability for consequential damages and should be enforced. Delmarva argues in response that PIC breached its express warranties and that the clause excluding consequential damages is unconscionable and should not be given effect.

### 1. Unconscionability

 As noted above, the contract between PIC and Delmarva expressly limited PIC's liability for losses resulting from communicable diseases to the credit procedure outlined in the contract.[11] Consequential damages [12] were expressly excluded from the remedies available. The U.C.C. permits parties to agree to limit consequential damages **"unless the limitation or exclusion is unconscionable."** U.C.C. § 2–719(3). Referring to U.C.C. § 2–302,[13] comment 1 to § 2–719(3) includes the following explanation:

1. Under this section parties are left free to shape their remedies to their particular requirements and reasonable agreements limiting or modifying remedies are to be given effect.

However, it is of the very essence of a sales contract that at least minimum adequate remedies be available. If the parties intend to conclude a contract for sale within this Article they must accept the legal consequence that there be at least a fair quantum of remedy for breach of the obli-

---

11. PIC would credit the customer the purchase price of the animal, minus the animal's slaughter value, in the event a pig was not fit for breeding within five months (under the pre–1990 contract, the period was six months) of delivery.

12. Consequential damages include lost profits, the remedy sought by Delmarva in this case. *See, Chestnut Hill Development Corp. v. Otis Elevator Co.,* 739 F.Supp. 692, 701 (D.Mass.1990).

13. U.C.C. § 2–302(1) provides in relevant part that "[i]f the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit

the application of any unconscionable clause as to avoid any unconscionable result." Unconscionability, therefore, is a question of law for the court and proper for resolution on summary judgment. *See, Golden Reward Mining Co. v. Jervis B. Webb Co.,* 772 F.Supp. 1118, 1121 (D.S.D.1991); *Boone Valley Co-op. Processing Ass'n v. French Oil Mill Machinery Co.,* 383 F.Supp. 606, 612 n. 4 (N.D.Iowa 1974); *Martin Rispens & Son v. Hall Farms, Inc.,* 621 N.E.2d 1078, 1086 (Ind.1993); *Trinkle v. Schumacher Co.,* 100 Wis.2d 13, 301 N.W.2d 255, 258 (App. 1980); *Wilson Trading Corp. v. David Ferguson, Ltd.,* 23 N.Y.2d 398, 297 N.Y.S.2d 108, 111–12, 244 N.E.2d 685, 687 (1968); 1 James J. White and Robert S. Summers, Uniform Commercial Code § 12–11 n. 9 (4th ed. 1995).

gations or duties outlined in the contract. Thus any clause purporting to modify or limit the remedial provisions of this Article in an unconscionable manner is subject to deletion and in that event the remedies made available by this Article are applicable as if the stricken clause had never existed. . . .

Because contractual limitations upon remedies are generally to be enforced unless unconscionable, *Wilson Trading Corp. v. David Ferguson, Ltd.*, 23 N.Y.2d 398, 297 N.Y.S.2d 108, 111–12, 244 N.E.2d 685, 687 (1968), the party claiming unconscionability has the burden of proof.

Delmarva argues that where, as here, "circumstances cause an exclusive or limited remedy to fail its essential purpose," the buyer can resort to any remedy available under the code, including the remedy of consequential damages. U.C.C. § 2–719(2). (D.I. 64 at 23–4) More specifically, Delmarva claims that PIC's credit provision was inadequate and failed of its essential purpose where the porcine defect was latent and, therefore, not discoverable during the five months following delivery.

In support of its contentions, Delmarva cites to the case of *Neville Chemical Co. v. Union Carbide Corp.*, 294 F.Supp. 649 (W.D.Pa.1968), *vacated in part on other grounds*, 422 F.2d 1205 (3d Cir.), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). In that case, Neville brought suit against Union Carbide for business losses occasioned when contaminated oil purchased from Union Carbide was introduced into Neville's end products, resins which were manufactured by Neville's customers into finished products such as floor tiles, shoe soles, paper coatings, and the like. The contaminant was not discoverable until a chemical reaction in the finished products caused a persistent foul odor to be emitted, which in turn required the removal or destruction of the finished products. The contract of sale between Neville and Union Carbide included a time limitation (which provided that the buyer unqualifiedly accepted all material and waived all claims in respect thereto unless notice was given within 15 days of delivery) and a dam-

age limitation (which limited claims to the purchase price of the material).

In determining whether such contract provisions were unconscionable, the court observed that the limited remedy provided by the contract

would be wholly inadequate in the case of a latent defect not discoverable within a reasonable period after receipt of shipment. Like the fifteen day limitation, it is obviously designed to cover a situation where the defect is discoverable upon receipt of shipment, reasonable inspection and prompt discovery of defects. The parties can be restored by prompt notification to the seller, return of the purchase price, and return of the material. But when the defect is not ordinarily discoverable until the material has been processed, furnished to manufacturers, processed into materials, then manufactured into consumer goods, passed through the wholesale and retail trade into the hands of consumers, **then such a remedy is far below a bare minimum in quantum, and is ineffective under the Uniform Commercial Code, § 2–719(2).**

Such limitations on time and damages, when the defect is latent, are illusory and under the circumstances of this case represent no remedy at all.

*Id.* at 655 (emphasis added). *Accord, Comind, Companhia de Seguros v. Sikorsky Aircraft Division*, 116 F.R.D. 397, 414 (D.Conn.1987) (question of whether product's defect was latent and not reasonably discoverable within the contract's time limitation gave rise to doubts about validity of contract's remedy limitation under U.C.C. § 2–719(2), sufficient to deny motion for summary judgment); *Majors v. Kalo Laboratories, Inc.*, 407 F.Supp. 20, 22–23 (M.D.Ala.1975) (citing *Neville* and U.C.C. § 2–719(2), court found limitation of remedy clause unconscionable where the purchased product, a soybean inoculant, had a latent defect which could not be detected until the soybean crop had been cultivated, planted and harvested); *Trinkle v. Schumacher Co.*, 301 N.W.2d at 259 (where defect in fabric not discoverable until after time limitation of sales contract expired, limited remedy inadequate within

meaning of U.C.C. § 2–719(2) and, therefore, limited remedy provision unconscionable); *Wilson Trading Corp. v. David Ferguson, Ltd.*, 244 N.E.2d at 688 (where defect in yarn not discoverable until after time limitation of sales contract expired, limited remedy inadequate within meaning of U.C.C. § 2–719(2) and, therefore, limited remedy provision unconscionable).

■ Assuming that Delmarva is asserting its argument in an appropriate analytical framework,[14] nevertheless, the case at bar is factually distinguishable from all of the cases cited by Delmarva. Not only did Delmarva have the means to discover the "defect"[15] (through serology tests) at the time of delivery, it had reason to be looking for the defect (industry literature,[16] the positive result from testing its own herd, and Fort's conversation with Koenig[17]). The fact that PIC could have done more to inform Delmarva of the PRRS risk does not negate the fact that the defect at issue was in fact discoverable; Delmarva chose to assume the risk of complacence. The court concludes that the consequential damage exclusion contained in the PIC/Delmarva contract is not unconscionable pursuant to U.C.C. § 2–719(2).

■ Delmarva relatedly contends that the consequential damage exclusion should be stricken as unconscionable under the reasoning of U.C.C. § 2–302. A party seeking to avoid the consequences of a limitation of remedy clause on this ground has the burden of demonstrating procedural and/or substantive unconscionability. "Procedural unconscionability involves some impropriety during the process of forming the contract depriving a party of meaningful choice while substantive unconscionability deals with the terms of the contract itself and whether they are commercially reasonable." *Jones v. Asgrow Seed Co.*, 749 F.Supp. 836, 837–38 (N.D.Ohio 1990). A party seeking to demonstrate unconscionability in a commercial setting has a heavy burden of proof. *Id.* at 838–39. *See also*, 1 James J. White and Robert S. Summers, Uniform Commercial Code § 4–9 n. 2, § 12.11 n. 13 (4th ed. 1995) and the cases cited therein.

■ In support of its position that the contract at issue was procedurally unconscionable, Delmarva cites to *Martin v. Joseph Harris Co., Inc.*, 767 F.2d 296 (6th Cir.1985). Plaintiffs in that case, independent, relatively small farmers, brought suit against defendant, a large national producer and distributor of seed, claiming damages for defective cabbage seed. In determining the presence of procedural unconscionability, the court reviewed the relative economic strength of the parties, the alternative sources of supply,[18] and the fact that the contract had been altered in significant ways without explanation by the seller to the buyers, who were "uncounseled laymen." *Id.* at 301. *See also, Frank's Maintenance & Engineering, Inc. v.*

---

14. According to some commentators, U.C.C. § 2–719(2) should be triggered only when the **remedy** fails of **its** essential purpose, not the essential purpose of the U.C.C., contract law, or of equity. For example, where the sale of a car is accompanied by the exclusive remedy of repair and replacement of defective parts but attempted repairs are ineffective in correcting the problems, the purchaser is entitled to recover an amount in excess of the cost of repairs. *Riley v. Ford Motor Co.*, 442 F.2d 670 (5th Cir.1971). Where, as here, the limited remedy provision serves its purpose, that is, to limit contract liability to the purchase price (minus slaughter value) of the livestock, the contract term has not failed its essential purpose. *See, Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d at 1085–86; 1 James J. White and Robert S. Summers, Uniform Commercial Code § 12–10 (4th ed. 1995).

15. The "defect" identified by Delmarva is a positive result to the PRRS antibody serology test. However, given the fact that Delmarva had not conducted sufficient testing to determine whether its existing herd was positive or negative, it is arguable whether a "defect" even existed.

16. *See*, D.I. 60 at A161.

17. The record does not support the assertion by Delmarva that persons acting on behalf of PIC misrepresented the risks involved with PRRS or that Delmarva acted responsibly and reasonably in relying on such representations, given the information available to it. *Cf. Rayle Tech, Inc. v. Dekalb Swine Breeders, Inc.*, 897 F.Supp. 1472, 1477 (S.D.Ga.1995); *Urschel Farms, Inc. v. Dekalb Swine Breeders, Inc.*, 858 F.Supp. 831, 840 (N.D.Ind.1994).

18. In this regard, the court found a situation where "goods [could] only be obtained from ... several sources on non-competitive terms ... and doing without [was] not a realistic alternative." *Id.* at 301.

*C.A. Roberts Co.*, 86 Ill.App.3d 980, 42 Ill. Dec. 25, 33, 408 N.E.2d 403, 411 (1980) (limiting clause not conspicuous and not known to buyer at time contract made); *Dessert Seed Co., Inc. v. Drew Farmers Supply, Inc.*, 248 Ark. 858, 454 S.W.2d 307, 309 (1970) (orders for seed placed by telephone so that buyer's agents had not seen limitation of liability wording, which language was not conspicuous in any event).

Even if one assumes for purposes of this proceeding that Delmarva had relatively less bargaining power than PIC in the transactions at bar (assuming PIC's relative economic strength and the existence of non-competitive [19] alternative sources of supply), the record indicates that the language in dispute was unambiguous and conspicuous. Moreover, Mr. Klein was a knowledgeable businessman who understood the terms of the agreement, did not attempt to negotiate different terms, and took advantage of the limited remedy provision on numerous occasions. The court declines to find procedural unconscionability in light of this commercial setting. *See, Urschel Farms, Inc. v. Dekalb Swine Breeders, Inc.*, 858 F.Supp. at 837.

 Delmarva proffers as a final argument the substantive unconscionability "of disclaiming liability for consequential damages occasioned by latent defects. . . ." (D.I. 64 at 25) Delmarva once again cites to *Martin v. Joseph Harris Co., Inc.* in support of its contentions. The seller in *Martin* had discontinued a successful method of treating cabbage seed to eradicate a fungus known as "black leg" (a seed-borne disease that causes affected plants to rot before maturing), but had failed to inform the buyers, previous customers, of that fact. The court held:

> Significantly, in the present case not only was the defect latent, but it was also one which was within the control of Harris Seed to prevent. Even if [the buyers] had been apprised of and understood the significance of Harris Seed's decision to discontinue hot water treatment, they would have been unable to detect the presence of the disease in the seed until their crop had developed into young plants. If Harris Seed were permitted to rely on the dis-

claimer and limitation clause to avoid liability under the facts of this case, the farmers who had no notice of, ability to detect, or control over the presence of the black leg could lose their livelihood. On the other hand, Harris Seed which had the knowledge, expertise and means to prevent the disease would only lose a few hundred dollars. Given the unique facts of this case, and giving "considerable weight" to the district court's decision that Michigan law would not permit the disclaimer and limitation clause to be enforced under such circumstances, we affirm the district court's finding of unconscionability.

767 F.2d at 301–02.

As already discussed, Delmarva in its position fails to differentiate between a discoverable and undiscoverable latent defect. Significantly, in 1992, PRRS was detectable and Delmarva could have administered serology tests of the PIC livestock at the time of delivery (which would have been required in any event to determine the status of the particular livestock delivered). PIC did not have exclusive control over information about PRRS and certainly did not have the means to prevent the disease. The PIC/Delmarva contract clearly contemplated the risk of communicable disease and allocated that risk within the parties' commercial relationship. Under these circumstances, the court concludes that the limitation of remedies clause is not substantively unconscionable and, therefore, is enforceable. PIC's motion for summary judgment will be granted in this regard.

### 2. Express warranties

 Delmarva contends in its counterclaim that, by delivering livestock from herds which had tested serologically positive for PRRS antibodies, PIC violated its express warranty that its livestock would be "inspected and certified in accordance with federal and state animal health regulations." Delmarva refers the court to language found in 21 U.S.C. § 115 prohibiting "any person, company, or corporation" from transporting interstate "any livestock and/or live poultry, knowing them to be affected with any conta-

---

19. Non-competitive in terms of standard contractual language, not in terms of pricing.

gious, infectious, or communicable disease...." The statute goes on to provide, however, that

> such livestock or poultry may be so delivered and received for such transportation and so transported and moved if the Secretary of Agriculture determines that such action will not endanger the livestock or poultry of the United States and authorizes such action, and such delivery, receipt, transportation, and movement are made in strict compliance with such rules and regulations as the Secretary of Agriculture may prescribe to protect the livestock and poultry of the United States.

The Department of Agriculture's regulations on pre-shipment inspection of feeder and breeder swine require that the swine be inspected at the point of origin by an accredited veterinarian and "found to be apparently free of hog cholera and other contagious, infectious, or communicable diseases." 9 C.F.R. § 76.12 (Schedule B) (1995). Each shipment of breeding stock to Delmarva was accompanied by a certificate from the animals' state of origin which required an accredited veterinarian to certify that the animals, upon inspection, were "not showing signs of infectious, contagious, and/or communicable disease...." (D.I. 42 at ¶ 13; D.I. 60 at A206–07) There is no evidence of record to indicate that the practice followed by PIC and the various accredited veterinarians who so certified PIC's shipments violated federal law.

Similarly, there is no evidence of record that the certifications which accompanied each delivery of PIC livestock violated the law of Maryland or any other state law. Although the Maryland Agricultural Code prohibits the importation of swine unless an accredited veterinarian "states that they are free from every infectious or contagious disease," Md.Code Ann., Agri. § 3–403 (1985), the testimony of the field veterinarian for the State of Maryland who certified livestock delivered to Delmarva demonstrates that this provision has never been interpreted to apply to PRRS. (D.I. 60 at A334–40)

Based on the record, the court finds as a matter of law that PIC did not breach its express warranty of inspection and certifica-

tion. PIC's motion for summary judgment, therefore, will be granted in this regard.

Delmarva also counterclaims that, because PRRS impairs the productivity of breeding stock, PIC violated its express warranty that its animals were "fit for breeding." Delmarva relies on the opinion of "longtime pig-breeder" Lynn Cole for the proposition that PIC "failed to abide by accepted standards of ethical behavior in the pig-breeding industry" when it represented, despite the undisputed nature of PRRS, that its PRRS-infected or PRRS-exposed stock was fit for breeding. (D.I. 64 at 21; D.I. 65 at B87–88)

PIC asserts in support of its motion for summary judgment that the "fit for breeding" warranty has to be construed consistently with the limitation of remedy provisions discussed above. U.C.C. § 2–316 ("Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other...."). Thus, according to PIC, " 'fit for breeding' ... does not mean that animals do not carry communicable disease. Similarly, the contract does not guarantee that animals will be fit for breeding forever, but only within five months of delivery." (D.I. 59 at 32) PIC also denies the existence of any evidence that PIC shipped animals that were carrying PRRS antibodies: "[N]o testing was performed on PIC animals while they were in isolation, and of the serological tests that were performed, there is no evidence that those animals tested were PIC animals (as opposed to animals internally bred by Delmarva)." (D.I. 59 at 32; D.I. 60 at A352, A325) Moreover, PIC points to testimony of record that an animal is not necessarily "unfit for breeding" just because it carries PRRS antibodies. (D.I. 59 at 32; D.I. 60 at A209, A220–21, A223, A324)

The court agrees with PIC's application of U.C.C. § 2–316 and concludes that the "fit for breeding" warranty is limited by the other provisions of the contract. The court further finds, however, that there are genuine issues of material fact about the "fitness" of the PIC livestock within those limitations. Therefore, PIC's motion for summary judgment will be denied in this regard.

### 3. Implied warranties

PIC argues in support of its motion for summary judgment that the PIC/Delmarva contract properly excludes implied warranties under the U.C.C. Under the U.C.C., a disclaimer of warranties is enforceable between merchants as long as it meets certain conditions. A disclaimer validly excludes the implied warranty of merchantability if it mentions "merchantability" and, if written, is "conspicuous."

Language to exclude all implied warranties of fitness is sufficient if it states "that there are no warranties which extend beyond the description on the face hereof." U.C.C. § 2–316(2). PIC's "Disclaimer of Warranties" provision precisely tracks this language.

Likewise, PIC's disclaimer is conspicuous. The provision is written "in larger or contrasting type or color" on both the front and the back of the contract. *See,* Md.Code Ann., Com.Law I § 1–201(10) (1992); *Jaskey Fin. and Leasing v. Display Data Corp.,* 564 F.Supp. 160, 164 (E.D.Pa.1983).

Finally, the record demonstrates that Delmarva, which did not respond to this argument in briefing, was aware of the disclaimer and accepted it. (D.I. 60 at A166–178) *See, Twin Disc, Inc. v. Big Bud Tractor, Inc.,* 772 F.2d 1329 (7th Cir.1985). Therefore, the court concludes that there is no factual dispute with respect to the enforceability of the implied warranty disclaimer. Summary judgement will be granted in favor of PIC on this claim.

### 4. Notice provision

PIC asserts in its motion for summary judgment that U.C.C. § 2–607 bars Delmarva from any U.C.C. remedy because Delmarva from any U.C.C. remedy because Delmarva's notice of a possible breach of contract was untimely as a matter of law. Section 2–607(3) provides that, where a tender has been accepted, "the buyer must **within a reasonable time after he discovers or should have discovered** any breach notify the seller of breach or be barred from any remedy." (Emphasis added) In support of its motion, PIC cites cases where a delay in notice was found to be unreasonable as a matter of law. In *Hepper v. Triple U*

*Enterprises, Inc.,* 388 N.W.2d 525 (S.D.1986), for example, the court held that the buyer's delay of over one year in notifying the seller that the purchased buffalo had brucellosis in breach of purchase was unreasonable; although the buffalo aborted within a few months after purchase, the buyer apparently ignored its veterinarian's recommendation that the herd be tested. *Id.* at 526–28. *See also Bennett v. Jansma,* 329 N.W.2d 134 (S.D.1983) (although buyer discovered his cattle were sick the day after he purchased them, he did not notify seller until four and one-half months later); *White v. Mississippi Order Buyers, Inc.,* 648 P.2d 682 (Colo.App. 1982) (a delay of 3 weeks found to be unreasonable where notice that cattle were sick was given after cattle had been disposed of and after diagnosis had been made).

Delmarva does not specifically respond to this ground for summary judgment. The record presented, although sufficient to convince the court that Delmarva could have promptly discovered the "latent defect" complained of (a positive serology test for PRRS antibodies), presents genuine issues of material fact as to whether Delmarva timely notified PIC of its assertion that the PIC livestock was unfit for breeding by reason of an active disease process. Therefore, Delmarva is not precluded from pursuing its express warranty claim consistent with the contractual limitations addressed above.

### B. Tort claims

Delmarva asserts claims of negligence and negligent misrepresentation in its counterclaim based presumably on allegations that PIC did not advise Duane Fort of the serological status of the PIC livestock and, instead, "dissuaded" him from inquiring further. (*See* D.I. 64 at 13–14) PIC argues in support of its motion for summary judgment that Delmarva cannot prevail on its tort claims because PIC owes no duty to Delmarva independent of the contract. In explanation, PIC urges the court to

recognize the fundamental distinction between claims in tort and claims in contract—contract duties are those specifically agreed upon by the parties, while tort duties are those imposed by the state for

the purpose of protecting a vulnerable party.... [I]n those instances where the relationship between parties is purely contractual, and the heart of plaintiff's claims is the defendant's failure to perform the contract, contract damages will suffice to compensate the plaintiff—no extra protection for the parties is necessary....

Normally, contractual damages are sufficient for two reasons. First, where the relationship is purely contractual and the injury purely economic, parties have an opportunity to insure against such economic losses.... Second, ... where parties are equally sophisticated in the general ways and affairs of business, the parties are in a position to contractually allocate risks among one another.

*Martin Marietta Corp. v. INTELSAT,* 763 F.Supp. 1327, 1331–32 (D.Md.1991), *rev'd in part on other grounds,* 991 F.2d 94 (4th Cir.1992). *See also, 21st Century Properties Co. v. Carpenter Insulation & Coatings Co.,* 694 F.Supp. 148 (D.Md.1988); *Nixon Uniform Service v. American Directory Service Agency, Inc.,* 693 F.Supp. 367 (D.Md.1988); *Flow Industries, Inc. v. Fields Construction Co.,* 683 F.Supp. 527 (D.Md.1988).

Cited in response by Delmarva is *Jacques v. First National Bank,* 307 Md. 527, 515 A.2d 756 (App.1986), an economic loss case involving the negligent processing of a loan application. The court in *Jacques* initially found that a contract was created between the parties, and that this contract included an implied promise to use reasonable care. The state court then focused its attention on the nature of the legal relationship between the parties. The court noted in this regard that the "rather extraordinary" contract provisions "left the Jacques particularly vulnerable and dependent upon the Bank's exercise of due care." *Id.* 515 A.2d at 762. The court emphasized the public nature of the banking industry and its close relationship with the public interest. Based on these observations, the court recognized both a tort duty and a contractual duty.

Unlike the defendant bank in *Jacques,* PIC is not imbued with any special "public calling." As the court has found previously, PIC and Delmarva were equally sophisticated in the general ways and affairs of business. They engaged over the course of years in a contractual relationship by which their respective business risks were allocated. The court concludes that the instant case does not present circumstances in which the law creates an extra-contractual tort duty to exercise due care to avoid negligence or to exercise reasonable care in making representations.

 Delmarva also asserts claims of fraud and fraudulent concealment. Contracts have traditionally been voidable on the grounds of fraud, a tort concept. The elements of legal fraud are (1) a false representation made by a party; (2) the party knew the falsity of the representation or recklessly disregarded its falsity; (3) the misrepresentation was made for the purpose of defrauding some other person; (4) that person relied on the misrepresentation and had the right to rely on the misrepresentation; (5) that person suffered damage arising from the misrepresentation. *See, e.g., Martens Chevrolet, Inc. v. Seney,* 292 Md. 328, 439 A.2d 534 (1982); *Harman v. Masoneilan Int'l, Inc.,* 442 A.2d 487 (Del.1982). As a predicate for a fraud action, a representation must be definite; mere vague, general or indefinite statements are insufficient. *Fowler v. Benton,* 229 Md. 571, 185 A.2d 344, 349 (App. 1962). Where the alleged misrepresentation consists of an omission, the plaintiff must establish an affirmative duty to disclose. *See, Stephenson v. Capano Development, Inc.,* 462 A.2d 1069, 1074 (Del.1983); *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.,* 283 Md. 296, 389 A.2d 887, 903 (1978).

 Discovery has been completed in the case at bar and Delmarva has been given the opportunity to respond to PIC's motion for summary judgment based on the record compiled during the discovery process. The only evidence that Delmarva has provided the court in opposition to the motion is that of Duane Fort's conversations with Drs. Armbrecht and Loula and the fact that PIC was a consultant until 1991. As recounted above, Fort did not recall these veterinarians offering any specific advice that could be characterized as fraudulent. In connection with PIC's consultative capacity, Mr. Klein could

not recall "dates, times, places and people," but opined that PIC

> [i]n general, and in its publications, there are newsletters, there are various papers that come periodically from PIC, there is a representation of these animals, and in the contract, and as the contract is extended by the veterinarian's warranties with each shipment, there is a constant refrain and representation which I took as a representation that these animals are free from communicable disease. That was my understanding. Certainly, they were free from it to the extent that PIC was aware. I took it as a flat warranty that there was no communicable disease.

(D.I. 60 at A 179–80)

Delmarva asserts that in providing consulting services to Delmarva from approximately 1989 to 1991, PIC failed to advise Delmarva "that it should consider testing its animals for PRRS, nor did it ever suggest that Delmarva should consider that PRRS might be the cause of Delmarva's problems." (D.I. 64 at 18, citing D.I. 65 at B14, B98–99) Delmarva concludes: "The reason for PIC's silence, of course, is obvious." (D.I. 64 at 18) There is no evidence, however, that PIC ever assumed an extra-contractual duty of care or of disclosure.[20]

The court declines to find that the record upon which Delmarva relies is sufficient to overcome PIC's motion for summary judgment as it relates to Delmarva's fraud claims. There is simply no evidence of misrepresentations made by PIC for a fraudulent purpose or of an extra-contractual duty to disclose which was breached.

### C. Maryland Consumer Protection Act

 Delmarva has claimed protection under Maryland's Consumer Protection Act (the "Act"), which provides for public and private actions against any person (including corporations) who engages in "unfair or deceptive trade practices" in the provision of any consumer good or service in which the State of Maryland has an interest." The Act defines a consumer as "an actual or prospective purchaser ... of consumer goods ..."

and further provides " 'consumer goods' ... [are those used] primarily for personal, household, family, or agricultural purposes." Md.Code Ann., Com.Law I § 13–101 (1990).

Delmarva argues, *in toto*, that the court need look no further than the plain meaning of the statute to divine that "the statute's scope extends to purchasers of agricultural products, such as Delmarva." (D.I. 64 at 41) The entire statutory scheme and Maryland case law indicate to the contrary. For example, the Act's specific provisions are directed toward uninformed consumers, not experienced business people. *See, e.g.*, § 13–304 prohibits sellers from requiring buyers to furnish names of other prospective buyers to obtain a discount or other credit; § 13–305 prohibits sellers from awarding prizes that may only be redeemed by the purchase of goods, payment of money or submission to a sales pitch; § 13–306 requires merchants advertising sales to give buyers rain checks when promotional sales items run out ahead of schedule.

Moreover, business people who have invoked the Act's protection have had their complaints dismissed. In *Boatel Industries, Inc. v. Hester,* 77 Md.App. 284, 550 A.2d 389, 399 (1988), for example, the court refused to allow suit under the Act by an individual who established a corporation for the purpose of owning, showing and ultimately reselling a yacht. The court held that the definition of consumer goods under the Act is "for all practical purposes, the same as that in § 9–109 of the Maryland Commercial Code," which defines goods as consumer goods if used or brought primarily for personal, family, or household purposes. *Id.* 550 A.2d at 399. *See also Layton v. AAMCO Transmissions, Inc.,* 717 F.Supp. 368, 371 (D.Md.1989) (franchisees are not consumers).

Sales and contracts for the sale of goods between merchants are regulated by the Maryland Commercial Code. As explained by the Maryland Supreme Court in *Morris v. Osmose Wood Preserving,* 340 Md. 519, 667 A.2d 624, 635 (1995), allowing suits between business people under the Act "would serve only to reallocate the risks of loss under their contracts without providing any additional protection to consumers." The court, there-

---

20. The status of Count VIII of Delmarva's amended counterclaim is not clear.

fore, concludes that the Act was not designed to extend its protection to the commercial setting at bar. PIC's motion for summary judgment will be granted in this regard.

### D. PIC's Claim for Payment

PIC instituted this suit to obtain payment for pigs sold to Delmarva. Although nothing has been presented to the court to suggest any genuine issues of material fact concerning the computation of PIC's claim (and, therefore, none will be entertained at trial), Delmarva has one triable defense to payment (the "fit for breeding" express warranty). Consequently, summary judgment shall not be entered in favor of PIC on its claim for payment.

### V. CONCLUSION

For the reasons stated, PIC's motion for summary judgment shall be granted in all respects save for Delmarva's claim that PIC breached its express warranty that its pigs were fit for breeding, as that warranty is contemplated by the contract. Given the existence of a triable defense, PIC's motion for summary judgment on its claim for payment likewise shall be denied.

Delmarva's untimely discovery request for the depositions of various PIC customers is denied.

An order shall issue.