In re U.S. OFFICE PRODUCTS CO.
SECURITIES LITIGATION.

Jack Meehan, Fran Meehan, Christo-
pher Meehan, Beth Meehan, Gordon
Tingets, Les Asher, Michael Dickens,
and William Durniak, Plaintiffs,

v.

U.S. Office Products Co., Jonathan J.
Ledecky, and James Claypoole,
Defendants.

Master File No. No. 99–
MS–137 (RMU).
MDL No. 1271.
Civil Action No. 99–63(GMS).
Doc. No. 44, 62, 63.

United States District Court,
District of Columbia.

March 4, 2003.

David Patrick Donovan, Wilmer, Cutler & Pickering, Washington, DC, Herbert Esar Milstein, Daniel S. Sommers, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, Lester L. Levy, Wolf Popper LLP, New York, NY, Richard B. Dannenberg, Jill Rosell, Richard Bemporad, Lowey Dannenberg Bemporad & Selinger, White Plains, NY, Andrew L. Barroway, David Kessler, Schiffrin & Barroway, LLP, Bala Cynwd, PA, Jules Brody, Aaron L. Brody, Stull, Stull & Brody, New York, NY, Richard E. Castiglioni, Diserio Martin O'Connor & Castiglioni LLP, Stamford, CT, James Linwood Quarles, III, Hale & Dorr, Washington, DC, Burton Hyman Finkelstein, Finkelstein, Thompson & Loughran, Washington, DC, Ann H. Rubin, Carmody & Torrance LLP, Dickinson Wright, Rock A. Wood, Grand Rapids, MI, for plaintiffs.

John Christopher Keeney, Jr., Hogan & Hartson, L.L.P., Washington, DC, David Patrick Donovan, John Quinn Rounsaville, Jr., Matthew A. Brill, Wilmer, Cutler & Pickering, Washington, DC, Richard A. Roth, Ira S. Meyerowitz, Littman, Krooks, Roth & Ball, P.C., New York, NY, Wiley E. Mayne, Charles W. Groscup, Denver, CO, for defendants.

### *MEMORANDUM OPINION*

GRANTING IN PART AND DENYING IN PART DEFENDANT USOP'S MOTION TO DISMISS;

GRANTING IN PART AND DENYING IN PART DEFENDENTS LEDECKY'S MOTION TO DISMISS;

GRANTING IN PART AND DENYING IN PART DEFENDENTS CLAYPOLLE'S MOTION TO DISMISS;

GRANTING THE PLAINTIFF'S MOTION FOR LEAVE TO AMEND THE COMPLAINT

URBINA, District Judge.

## I. INTRODUCTION

In October 1997, the plaintiffs sold their company, Aztec International ("Aztec"), to defendant U.S. Office Products ("USOP") in exchange for 720,000 shares of USOP common stock. After the merger and before the plaintiffs sold their USOP stock, the value of the USOP stock decreased significantly. In response, the plaintiffs filed a 20–count complaint claiming con-

tract violations, fraud, negligence, negligent misrepresentation, conspiracy, and breach of fiduciary duty on the part of the defendants. The complaint addresses two contracts: the written Agreement and Plan of Reorganization ("Reorganization Agreement") governing the merger of Aztec and USOP, and an oral contract wherein the defendants allegedly promised to compensate the plaintiffs for the loss in value of their USOP stock. In the Second Amended Complaint ("complaint"), the plaintiffs claim that the defendants breached the contracts, made false statements regarding the contracts, and fraudulently induced the plaintiffs to enter into the contracts.

The plaintiffs originally filed this action in the United States District Court for the District of Delaware. The Judicial Panel on Multi-District Litigation transferred the case to this court for pretrial proceedings as part of the USOP Multi-District Litigation ("MDL") pending in this court. This case and others in the USOP MDL action involve defendants USOP; Jonathan Ledecky, the former President, Chief Executive Officer, and Chairman of USOP; and James Claypoole, the President of the Technology Solutions Division of USOP. This matter is now before the court on the defendant USOP's, Ledecky's, and Claypoole's separately filed motions to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the court grants in part and denies in part the defendants' motions to dismiss.

## II. BACKGROUND[1]

### A. Summary of the Case

The plaintiffs are the former owners of Aztec, a closely held Delaware corporation located in Connecticut that the plaintiffs sold to defendant USOP in October 1997. Compl. ¶ 4. Plaintiffs Jack and Fran Meehan, Les Asher, and Gordon Tingets reside in Connecticut, plaintiffs Beth and Christopher Meehan reside in Colorado, plaintiff William Durniak resides in New York, and plaintiff Michael Dickens resides in Texas. Id. ¶¶ 7–15. The plaintiffs claim that during negotiations regarding the USOP–Aztec merger, the defendants made false and misleading statements and omissions regarding USOP's future business strategy. E.g., id. ¶¶ 38, 62. The plaintiffs detrimentally relied on these false statements and agreed to sell Aztec to USOP based on these statements and omissions. Id. ¶ 38. The plaintiffs state that had they been aware of USOP's true business plans, they would not have sold Aztec to USOP. Id. ¶ 39.

Once the plaintiffs became aware of USOP's new business strategy, they met with defendants Ledecky and Claypoole in the District of Columbia in February 1998 to discuss their concerns. Id. ¶¶ 54, 55. At this meeting, defendant Ledecky guaranteed that USOP would provide the plaintiffs with consideration equal to that agreed upon for the sale of Aztec. Id. ¶ 56. Furthermore, Mr. Ledecky allegedly gave his personal guarantee that he would make the plaintiffs whole if USOP failed to do so. Id. Later, both Mr. Ledecky and USOP refused to provide the plaintiffs with the consideration they allegedly agreed to. Id. ¶ 61.

### B. Defendant USOP's Original Business Plan

Defendant Ledecky founded USOP, a company located in the District of Columbia and incorporated in Delaware, in 1994.

---

1. Because the court is resolving motions to dismiss, the court treats the facts alleged in the complaint as true. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

*Id.* ¶ 24. USOP's business strategy was to acquire existing companies in exchange for USOP stock and then group these companies together as a single corporate entity to achieve increased reported revenues, thereby increasing the value of USOP stock. *Id.* To maintain its stock price, USOP used business practices, such as the pooling-of-interests accounting method.[2] *Id.* ¶ 26. USOP could not use the pooling-of-interests accounting method, however, if it intended to engage in a buyback or spin-off of an acquired company within two years of the acquisition. *Id.* ¶ 26.

### C. Defendant USOP's Negotiations with Aztec

In early 1997, USOP representatives approached plaintiff Jack Meehan, Aztec's principal owner, about the possibility of acquiring Aztec. *Id.* ¶ 27. Based on USOP representatives' description of USOP's business plan, Jack Meehan and Eric Schwartz, president of USOP's Computer Network Services Division, entered into a confidentiality agreement. *Id.* USOP and Aztec then began acquisition discussions. *Id.* ¶¶ 27–28. During these discussions, USOP Technology Solutions President defendant Claypoole indicated that defendant Ledecky was directing USOP's strategy for this merger and that Mr. Ledecky was the visionary leader who would build USOP into an $8 billion company by the year 2000. *Id.* ¶ 28.

During the first week of October 1997, Aztec received a Letter of Intent from USOP confirming USOP's intent to acquire Aztec in exchange for 720,000 shares of USOP stock. *Id.* ¶ 31. USOP representatives refused the plaintiffs' original demand for cash consideration and represented that the all-stock deal would be beneficial to the plaintiffs because it would allow the transaction to qualify for pooling-of-interests accounting treatment. *Id.* To this end, USOP's Letter of Intent stated that "[t]he Proposed Acquisition [of Aztec] must qualify for the pooling-of-interest [sic] accounting treatment." *Id.*

During late October 1997, Aztec and USOP representatives negotiated the terms of the Reorganization Agreement. *Id.* ¶ 32. During these negotiations, USOP representatives provided the plaintiffs with copies of USOP's most recent prospectus and supplements, as well as various articles on USOP, Mr. Ledecky, and the nature of USOP's stock. *Id.* USOP did not mention any planned changes in its business strategy. *Id.* The Reorganization Agreement provided for total consideration ("Merger Consideration") of 720,000 shares of USOP Common Stock that were trading at a price of $37.5625 per share as of the closing date. *Id.* ¶ 34. The shares were subject to transfer restrictions in accordance with the pooling-of-interests accounting rules. *Id.* ¶ 35. These restrictions prohibited the plaintiffs from selling any of their USOP shares until USOP and Aztec operations had been combined for a period of 30 days after publication of their combined results in a public announcement. *Id.* USOP controlled the timing of this public announcement and the restriction on the plaintiffs' shares was set to expire in mid-February 1998. *Id.*

On October 24, 1997, the plaintiffs entered into the Reorganization Agreement with USOP and its subsidiary, Mason Acquisition Corporation. *Id.* ¶ 38. On the same day, the acquisition closed, Aztec became a subsidiary of USOP, and the Aztec shareholders were issued 720,000

---

**2.** When the "pooling-of-interests" accounting method is used in mergers the acquired company's assets are recorded on the acquiring company's books at their cost when originally acquired. Black's Law Dictionary (7th ed.1999). No goodwill account is created under the pooling method. *Id.*

shares of USOP stock with a total market value of $27,000,000.00. *Id.* ¶ 39.

### D. The Defendants' Alleged Misrepresentations and Omissions During the Negotiation of the Reorganization Agreement

The plaintiffs plead that, during the negotiations, USOP's representatives provided them with false and misleading information and failed to disclose other adverse information. *Id.* ¶ 38. The plaintiffs relied on this information and, if not for the defendants' omissions and false statements, they would not have entered into the Reorganization Agreement. *Id.* ¶¶ 39, 42, 45, 62.

From October 4 through 7, 1997, USOP held a Technology Solutions Presidents' Meeting in the District of Columbia. *Id.* ¶ 37. Mr. Claypoole presided over this meeting, which Computer Network Services Division President Eric Schwartz attended. *Id.* At this meeting Mr. Claypoole and other unnamed individuals discussed a new business strategy involving entering into a stock repurchase and spin-off transaction. *Id.* This new business strategy included spinning off the Technology Solutions Division, which was to include Aztec. *Id.* ¶¶ 28, 31.

The defendants knew that this spin-off (which would occur within two years of the Aztec acquisition) and repurchase plan would specifically disqualify USOP from using the pooling-of-interests accounting method specified in USOP's Letter of Intent. *Id.* ¶¶ 31, 36. In addition, USOP representatives had represented that Mr. Ledecky was the driving force behind USOP and that he and the company intended to continue making new acquisitions. *Id.* ¶ 30. Despite knowledge of the planned transition within USOP, the company's representatives failed to inform the plaintiffs of the transition, continued to sell USOP as an acquisition-driven company, and told them that USOP's strategy would

not undergo any drastic changes. *Id.* ¶¶ 32, 41.

### E. Post–Merger Events within Defendant USOP

On November 5, 1997, USOP announced that Mr. Ledecky was stepping down as President and Chief Executive Officer and that Tom Morgan would replace him. *Id.* ¶ 40. In the press release, Mr. Ledecky referred to Mr. Morgan's "outstanding service in transitioning [USOP] from an acquisition-driven company to one that is focused on exploiting the opportunities [it has] to realize tremendous operating efficiencies." *Id.* Mr. Ledecky announced the news to plaintiffs Jack Meehan, William Durniak, Les Asher, and Gordon Tingets during a conference call held that same day. *Id.* On November 21, 1997, USOP held a management retreat for its division presidents. *Id.* ¶ 42. At this retreat, the presidents received copies of a memorandum prepared by new USOP President Tom Morgan. *Id.* This memorandum stated that one of USOP's new priorities was to become less dependent on acquisitions. *Id.* Following these events, USOP's stock price dropped. *Id.* ¶ 43.

On January 13, 1998, USOP issued a detailed press release entitled "U.S. Office Products Announces Strategic Restructuring," revealing that USOP was planning a $1 billion self-tender for approximately 37 million shares at a price of $27.00 per share. *Id.* ¶ 44. USOP was also planning to spin-off four divisions: Corporate Travel Services, Education, Print Management, and Technology Solutions. *Id.* The company planned to incur approximately $800 million in additional indebtedness to fund the repurchase, the spin-offs, and a $270 million equity investment from a fund managed by Clayton, Dublier & Rice, a private equity firm. *Id.* The press release estimated that at the close of all transactions, USOP would have approximately

$1.3 billion in total indebtedness and announced that Mr. Ledecky would step down as chairman of USOP once the transactions were complete. *Id.* Following the publication of this press release, USOP's stock price dropped sharply. *Id.*

Although not mentioned in the press release, the transaction with Clayton, Dublier & Rice allowed USOP management personnel, including defendants Ledecky and Claypoole, to exercise stock options that the plaintiffs believe allowed the defendants to saturate the market with USOP stock. *Id.* ¶ 48. These options allowed USOP personnel to sell their stock for $27.00 per share, "a substantial premium to the then-current stock price, which has since repeatedly fallen." *Id.* Also on January 13, 1998, USOP notified the plaintiffs that the USOP stock that they received as Merger Consideration would be traded in for watered-down USOP stock and shares of stock in the four newly created spin-off companies. *Id.* ¶ 46.

On January 21, 1998, the plaintiffs began planning to sell their USOP stock pending the lifting of the pooling-of-interests transfer restrictions. *Id.* ¶ 52. When plaintiff Meehan contacted USOP by telephone, USOP's legal department informed Mr. Meehan that the restrictions were lifted on January 13, 1998. *Id.* Although USOP's legal department told Mr. Meehan that it had transmitted this information to Mr. Meehan's office, it later acknowledged that it had sent the notification to the wrong number. *Id.* Between January 13 and 21, 1998, USOP's stock price declined from $20.56 per share to an unspecified amount. *Id.* ¶ 53.

Once Mr. Meehan learned of USOP's mistake regarding the facsimile, he contacted Mr. Claypoole and demanded that Mr. Claypoole provide the plaintiffs with

solutions to their problems regarding the declining value of USOP's stock. *Id.* ¶ 54. On January 22, 1998, Mr. Meehan and Mr. Claypoole met in Florida and Mr Claypoole advised Mr. Meehan to "hold tight" and said he would arrange a meeting with Mr. Ledecky. *Id.*

### F. Plaintiff Meehan's February 11, 1998 Meeting with Defendants Ledecky and Claypoole

On February 11, 1998, plaintiff Meehan met with defendants Ledecky, then the Chairman of USOP, and Claypoole in the District of Columbia. *Id.* ¶ 55. Phillip Arturi and Bruce Torello [3] of Professional Network Services, another USOP Technology Division company, also attended the meeting. *Id.* At this meeting, Mr. Meehan informed Mr. Ledecky of his concerns and told him that he and the other shareholders wanted to be made whole. *Id.* Mr. Ledecky told Mr. Meehan that he was certain that the pending stock spin-off and tender offer would "make Plaintiffs whole" and earn them a profit. *Id.* ¶ 55. He also told Mr. Meehan "that his word was his bond, this is how he built his business and [he had] never gone back on [his] word." *Id.* (internal quotation marks omitted).

Mr. Ledecky stated that, if the post-split aggregate value of the spin-offs and the cash received from the stock self-tender failed to equal the Merger Consideration provided for in the Reorganization Agreement, USOP would make the plaintiffs whole. *Id.* ¶ 56. Mr. Ledecky also said he personally would make the plaintiffs whole if USOP failed to do so. *Id.* In consideration for these promises, and at the insistence of both Mr. Ledecky and Mr. Claypoole, the plaintiffs agreed to refrain from selling any of their USOP stock prior to

---

**3.** Messrs. Arturi and Torello are plaintiffs in *Arturi et al. v. U.S. Office Products Co. et al.,* a related action which also has been transferred to this MDL case.

the spin-off scheduled for April 25, 1998. *Id.* ¶ 56, Ex. A.

Mr. Claypoole urged the parties not to create a formal written agreement because "these deals were made behind closed doors." *Id.* ¶ 57. Mr. Meehan asked Mr. Ledecky if he would accept the details of the agreement in writing, but Mr. Ledecky refused. *Id.* Mr. Claypoole, however, did agree to accept a letter from Messrs. Meehan, Arturi, and Torello concerning the meeting and the "make-whole" agreement. *Id.* Mr. Meehan then asked Mr. Ledecky to shake hands to the agreement. *Id.* Mr. Ledecky did so and told Mr. Meehan "[y]ou have my word." *Id.*

On February 12, 1998, Mr. Claypoole telephoned Mr. Meehan to confirm that Mr. Ledecky had reached a satisfactory deal with Mr. Meehan. *Id.* Mr. Claypoole also urged Mr. Meehan to keep the specifics of the meeting confidential. *Id.* On February 15, 1998, Messrs. Meehan and Arturi sent a letter to Mr. Claypoole detailing the agreement ("Claypoole letter"). *Id.* ¶ 58, Ex. A.

### G. The May 21, 1998 Shareholders' Meeting

On May 21, 1998, Mr. Meehan and Mr. Arturi attended the USOP shareholders' meeting in the District of Columbia in an attempt to meet again with Mr. Ledecky. *Id.* ¶ 59. Mr. Ledecky met with Mr. Meehan and asked him to forward a copy of the Claypoole letter to him because he wanted to remind himself of the commitments he had made at the February meeting. *Id.* Mr. Ledecky then urged the plaintiffs to continue to hold their stock until September 7, 1998, 90 days after the spin-off of Aztec which had been rescheduled from April 25, 1998 to June 9, 1998. *Id.* ¶ 59, Ex. B. Mr. Ledecky assured Mr. Meehan that this spin-off would "more than make him whole." *Id.* On May 28, 1998, Mr. Meehan and Mr. Arturi sent Mr. Ledecky a new letter ("Ledecky Letter")

detailing the alleged February 11, 1998 agreement ("February 11 Agreement") and included a copy of the Claypoole letter. *Id.* ¶ 60, Ex. B.

### H. Post–Spin–Off Events

The plaintiffs allege that on September 4, 1998, defendant Ledecky sent an e-mail to Mr. Arturi, with copies to defendant Claypoole and other USOP officials, stating that Mr. Ledecky's "actions and discussions with [Mr. Arturi]—which were documented—were done in [his] capacity as an officer of USOP at the direction of [his] then colleagues." *Id.* ¶ 61. Once it became clear that the post-split aggregate value of the spin-offs and the cash received from the impending stock self-tender were less than the Merger Consideration, the plaintiffs demanded that USOP and Mr. Ledecky cover their losses. *Id.* Both USOP and Mr. Ledecky refused. *Id.*

### I. Procedural History

The plaintiffs originally filed this action in the United States District Court for the District of Delaware. Subject-matter jurisdiction in that court was premised on diversity of citizenship under 28 U.S.C. § 1332. The Judicial Panel on Multi–District Litigation transferred the case to this member of this court for pretrial proceedings pursuant to 28 U.S.C. § 1407, as part of the USOP MDL action. Subsequently, the plaintiffs filed a 20–count complaint focusing on the Reorganization Agreement and the February 11 Agreements and claiming breach of contract, promissory estoppel, unjust enrichment, fraud, fraudulent inducement, inducement by misrepresentation, negligent misrepresentation, negligence, civil conspiracy, breach of fiduciary duty, and violation of the Connecticut Unfair Trade Practices Act. On September 13, 1999 the defendants filed motions to dismiss the plaintiffs' complaint. Since the filing of these motions this MDL action was stayed several times due to bankrupt-

cy filings, MDL transfers, and mediation efforts. Renewed Mot. of Class Action Pls. to Restore Case to Active List at 1–2. On March 5, 2001 USOP filed a Notice of Bankruptcy. On January 4, 2002 USOP filed a Notice of Effective Date of Joint Liquidation Plan of Reorganization of USOP.

## J. The Plaintiffs' Withdrawn Counts

In their oppositions to the defendants' motions to dismiss, the plaintiffs agree to withdraw the fiduciary duty and conspiracy claims, Counts VI, VII, XIII, and XVII, in their entirety. Pls.' Opp'n (Ledecky) at 6 n. 4; Pls.' Opp'n (USOP)[4] at 2 n. 1; Pls.' Opp'n (Claypoole) at 6 n. 3.[5] The plaintiffs also agree to withdraw the fraud and misrepresentation claims regarding the Reorganization Agreement against defendant Ledecky contained in Counts II–V and VIII. Finally, the plaintiffs assert that they will withdraw the promissory estoppel claim regarding the February 11 Agreement against defendant Claypoole in Count XX. Pls.' Opp'n (Ledecky) at 6 n. 4; Pls.' Opp'n (Claypoole) at 6 n. 3.

## III. ANALYSIS

### A. Legal Standard for a Motion to Dismiss for Failure to State a Claim

For a complaint to survive a Rule 12(b)(6) motion to dismiss, it need only provide a short and plain statement of the claim and the grounds on which it rests. FED.R.CIV.P. 8(a)(2); *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). A motion to dismiss under Rule 12(b)(6) tests not whether the plaintiff will prevail on the merits, but instead whether the plaintiff has properly stated a claim. FED.R.CIV.P. 12(b)(6); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), *overruled on other grounds by Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The plaintiff need not plead the elements of a prima-facie case in the complaint. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511–14, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (holding that a plaintiff in an employment-discrimination case need not establish her prima-facie case in the complaint); *Sparrow v. United Air Lines, Inc.,* 216 F.3d 1111, 1114 (D.C.Cir.2000). Thus, the court may dismiss a complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Atchinson v. Dist. of Columbia,* 73 F.3d 418, 422 (D.C.Cir.1996).

In deciding such a motion, the court must accept all of the complaint's well-pled factual allegations as true and draw all reasonable inferences in the nonmovant's favor. *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683. The court need not accept as true

---

**4.** Local Civil Rule 7.1(e) states that a "memorandum of points and authorities in support of or in opposition to a motion shall not exceed 45 pages and a reply memorandum shall not exceed 25 pages, without prior approval of the court." Defendant USOP properly points out that the plaintiffs' 60–page opposition violates Local Civil Rule 7.1(e). Reply (USOP) at 1 n. 1. USOP, however, was not prejudiced by this violation because it submitted a 25–page reply that incorporates by reference 19 additional pages of a reply relating to a different motion to dismiss filed in this MDL case. *Id.* at 22–25. While the

parties' violations of Local Civil Rule 7.1(e) have inconvenienced the court, in this instance judicial efficiency favors moving forward with this resolution of the motions, rather than ordering both parties to refile their submissions using the proper page limitations.

**5.** All three defendants have filed motions to dismiss. Accordingly, when citing to the different motions to dismiss, oppositions, and replies, the court specifies the corresponding defendant in parentheses.

legal conclusions cast as factual allegations. *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994). While the court must generally limit its review to facts alleged within the complaint, the court may also consider facts of which judicial notice may be taken and documents that are both referenced in the complaint and central to the plaintiff's claim. *Phillips v. Bureau of Prisons*, 591 F.2d 966, 969 (D.C.Cir.1979); *Lipton v. MCI Worldcom, Inc.*, 135 F.Supp.2d 182, 186 (D.D.C.2001).

### B. Preliminary Issues

Before turning to the arguments regarding the specific counts, the court addresses two issues that affect the later rulings. The first issue is whether the February 11 Agreement is a contract separate from the Reorganization Agreement or a modification of the Reorganization Agreement. The second issue involves a determination of what law applies to the substantive claims in this diversity action.

### 1. Does the February 11 Agreement Modify the Reorganization Agreement Or Are the Two Agreements Separate Contracts?

█ Whether the February 11 Agreement modifies or is separate from the Reorganization Agreement is significant for two reasons. First, the Reorganization Agreement requires the parties to the agreement to file disputes regarding the Reorganization Agreement in Wilmington, Delaware, and to apply Delaware law. Reorganization Agreement § 10.8. Thus, the characterization of the February 11 Agreement determines which law the court should apply to the relevant claims. The second reason is that the parties agreed that the Reorganization Agreement "shall not be amended or modified except by a written instrument duly executed by each of the parties hereto...." *Id.* § 10.2. Thus, if the oral February 11 Agreement is a modification of the Reorganization Agree-

ment, it violates the Reorganization Agreement. *Id.*

The plaintiffs claim that the February 11 Agreement and the original Reorganization Agreement are two separate and independent contracts. Compl. ¶ 6; Pls.' Opp'n (Ledecky) at 4. The defendants contend that the February 11 Agreement, which would increase the plaintiffs' Merger Consideration, is merely an attempt to modify the Reorganization Agreement in response to the decrease in value of the USOP stock that constitutes the Merger Consideration. *E.g.*, Mot. to Dismiss (Ledecky) at 20–21.

As noted, when resolving a motion to dismiss, the court is not required to accept legal conclusions presented in a complaint as factual allegations. *Kowal*, 16 F.3d at 1276. Thus, the court is not required to defer to the plaintiffs' assertion that the February 11 Agreement and the original Reorganization Agreement are separate contracts. Rather, the court must evaluate this issue for itself. The court points out that the Reorganization Agreement already addresses circumstances that could result in an adjustment of the Merger Consideration. Reorganization Agreement §§ 1.3–1.4. As the February 11 Agreement addresses a possibility already addressed in the Reorganization Agreement—a need to adjust the Merger Consideration—the facts alleged in the complaint suggest that the court could deem the oral agreement a modification of the Reorganization Agreement. *See generally* Compl. Because this determination requires a factual analysis, and other relevant facts may also exist, the court defers this critical ruling to a later phase of this case. *Hishon*, 467 U.S. at 73, 104 S.Ct. 2229; *see Indep. Cellular Tel., Inc. v. Barker*, 1997 WL 153816, at *4–*5, 1997 Del. Ch. LEXIS 43 at *12–13 (Del. Ch.1997). For the limited purpose of ruling on the pending motions to dismiss, the court adopts the plaintiffs' assertion that

the Reorganization Agreement does not bar the possible existence of the February 11 Agreement. *Id.* Consequently, the Reorganization Agreement's choice-of-law provision does not, at this point, govern the claims regarding the February 11 Agreement and the Reorganization Agreement does not bar the oral agreement. Reorganization Agreement §§ 10.2, 10.8.

## 2. Choice-of-law Analysis

■ In a diversity action transferred pursuant to 28 U.S.C. § 1407(a), the transferee court applies the choice-of-law rules of the state where the transferor court sits. *Ferens v. John Deere Co.*, 494 U.S. 516, 518–19, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990). Because the transferor court in this case sits in Delaware, this court applies Delaware choice-of-law rules to determine what substantive law to apply to the contract claims regarding the Reorganization Agreement, the contract claims regarding the February 11 Agreement, and the tort claims regarding both agreements. *Ferens*, 494 U.S. at 519, 110 S.Ct. 1274.

### a. The Contract Claims Regarding the Reorganization Agreement

■ The Reorganization Agreement contains a clause wherein the plaintiffs and the defendants agree that any future contract claims relating to the Reorganization

Agreement shall be filed in Wilmington, Delaware and governed by Delaware law. Reorganization Agreement § 10.8. When a written contract contains a choice-of-law provision, Delaware courts apply the contract's choice of law so long as the selected jurisdiction has some material relationship to the transaction. *Annan v. Wilmington Trust Co.*, 559 A.2d 1289, 1293 (Del.1989). As USOP is incorporated in Delaware, Delaware has a material relationship to the Reorganization Agreement. *Id.* Consequently, § 10.8 is a valid choice-of-law provision and the court will apply Delaware law to the contract claims relating to the Reorganization Agreement. *Suburban Trust & Savs. Bank v. Univ. of Del.*, 910 F.Supp. 1009, 1013 (D.Del.1995).

### b. The Contract Claims Regarding the February 11 Agreement

■ Turning to the choice-of-law analysis for the contract claims regarding the February 11 Agreement, the court considers that Delaware courts apply the "most significant relationship test" to determine the law that applies to evaluations of both contract and tort claims. *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 47 (Del. 1991). The significant relationship test requires the court to apply the law of the state that has the most significant relationship to the occurrence and the parties.[6]

---

**6.** Defendant Ledecky uses the most significant relationship test to determine that District of Columbia law applies to the February 11 Agreement contract claims. Mot. to Dismiss (Ledecky) at 5 n. 5. In contrast, the plaintiffs submit that the court should apply the law of the two affected jurisdictions—the District of Columbia and Connecticut—because the laws of the affected jurisdictions do not conflict. *E.g.,* Pls.' Opp'n (Ledecky) at 9 n. 8 (citing *Pig Improvement Co., Inc. v. Middle States Holding Co.,* 943 F.Supp. 392, 396 (D.Del.1996)). The plaintiffs aver that because no conflict exists, this situation creates a false conflict. *Id.* The plaintiffs, however, do not explain why Connecticut is an "affected jurisdiction," why the laws of the two jurisdictions do not

conflict, and why the court should not apply the Restatement of Conflicts of Law's most significant relationship test. Larry Kramer, *Rethinking Choice of Law,* 90 Colum. L.Rev. 277, 291–92 (1990) (stating that a court should determine whether a state has an interest and only apply the law of the state with sufficient contacts to the claim). The court does not adopt the plaintiffs' approach because the portions of the plaintiffs' cases offered to support the false conflict argument do not rely on relevant Delaware law; and because, as demonstrated herein, the court is not convinced that Connecticut is an affected jurisdiction. Pls.' Opp'n (Ledecky) at 9 n. 8; *Merck & Co. v. SmithKline Beecham Pharms.,*

*Id.* In order to make this determination, the court applies the following considerations:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and the uniformity of result, and (g) ease in the determination and application of the law to be applied.

*Id.* (quoting Restatement (Second) of Conflicts of Law § 6 (1971)). *

For contract claims, the following factors also apply: (1) the place of contracting; (2) the place of negotiating; (3) the place of performance; (4) the location of the contract's subject-matter; and (5) the place of incorporation and the place of business of the parties. Restatement (Second) Conflicts of Law § 188 (1971); *Coca–Cola Bottling Co. of Elizabethtown, Inc. v. Coca–Cola Co.,* 668 F.Supp. 906, 918 (D.Del.1987). "If the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied." Restatement (Second) of Conflicts of Law § 188 (1971).

■ Applying the most significant relationship test to the facts of this case as they relate to the February 11 Agreement contract claims, the court notes that the alleged location of the negotiation and contracting is the District of Columbia. Compl. ¶¶ 55–59. The District of Columbia is the place of performance because it is where USOP and Ledecky would issue stock, pay the differential price, or decide not to perform. *Id.* ¶¶ 17, 18. Also, the plaintiffs wrote letters "memorializing" the

February 11 Agreement in Connecticut and mailed the letters to the defendants in the District of Columbia. *Id.* Exs. A–B. The contract's subject matter is unclear from the complaint though it does involve USOP stock and USOP is located in the District of Columbia. *Id.* ¶¶ 54–63. The place of incorporation of the parties is Delaware, as USOP is the only corporation that is a party. *Id.* ¶ 8. The place of business of the three defendants is the District of Columbia. *Id.* The place of business of plaintiff Jack Meehan is Connecticut and is unknown for the other plaintiffs. *Id.* ¶¶ 7–15. Though residence is not a factor for this significant relationship test, it is relevant for determining the affected jurisdictions: four plaintiffs reside in Connecticut, two in Colorado, one in New York, and one in Texas. *Id.* ¶¶ 7–15, 50.

Because the most important aspects of the contract claims—the place of negotiation and performance—occurred, or would have occurred, in the District of Columbia, the District of Columbia has the most significant relationship to the contract claims. Restatement (Second) of Conflicts of Law § 145 (1971); *Coca–Cola Co.,* 668 F.Supp. at 918. Indeed, the facts of this case demonstrate that the District of Columbia is the only jurisdiction with an interest in the contract claims. *Id.; Merck & Co. v. SmithKline Beecham Pharms.,* 1999 WL 669354, at *15 (Del.Ch. Aug.5, 1999) (determining that Pennsylvania law does not apply because only one factor—one defendant is a Pennsylvania corporation—favors its application).

### c. The Tort Claims

■ "Pursuant to Section 145 of the Second Restatement, the local law of the state which 'has the most significant relationship to the occurrence and the parties under the principles stated in § 6' will

1999 WL 669354, at *15 (Del.Ch. Aug.5, 1999).

govern the rights of litigants in a tort suit.'" *Travelers Indem.*, 594 A.2d at 47 (quoting Restatement (Second) of Conflicts of Law § 145 (1971)).[7] The court must look to the broader considerations quoted in the preceding subsection as well as the following factors: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered. *Id.;* Restatement (Second) of Conflicts of Law § 145 (1971). Courts should evaluate contacts involving different locations according to the locations' relative importance with respect to the relevant issues of the case. *Travelers Indem.*, 594 A.2d at 48 n. 6.

▆ Applying the factors in the order of their significance given the facts of this case, the court first considers the alleged conduct that caused the injuries—the conveying of the false information regarding the two contracts and the failure to transmit the facsimile. *Id.* The complaint does not state the location of all of the discussions, but the facsimile transmittal, the February and May 1998 meetings, and USOP's restructuring all occurred in the District of Columbia. Compl. ¶¶ 40, 44, 52, 55–59. Turning to the fourth factor of the test, the place where the parties' relationship is centered, the court considers that the parties met in the District of Columbia, their relationship is based on the their common ownership of USOP stock, and USOP is located in the District of Columbia. *Travelers Indem.*, 594 A.2d at 47; Compl. ¶¶ 17, 37, 40, 44, 50, 52, 55–59.

Applying the location of the injury factor for each tort claim, the court determines that the plaintiffs' financial losses most likely occurred where they lived, though this is not specifically alleged in the complaint. *Travelers Indem.*, 594 A.2d at 47; Compl. Four plaintiffs reside in Connecticut, two in Colorado, one in New York, and one in Texas. Compl. ¶¶ 7–15, 50. These facts lead into the third factor which requires consideration of the residences or places of business of the parties. *Travelers Indem.*, 594 A.2d at 47. Therefore, the court further observes that the defendants' place of business is the District of Columbia, USOP's place of incorporation is Delaware, one plaintiff's place of business is Connecticut, and the places of business of the remaining plaintiffs are not set forth in the complaint. Compl. ¶¶ 7–15, 17–19.

Accordingly, most of the parties' interactions and the misrepresentations and negligence, as alleged in the complaint, occurred in the District of Columbia. Considering the contacts involving the different locations according to the locations' relative importance with respect to the relevant issues of the case, the court determines that the District of Columbia is the only jurisdiction that has a significant relationship to the tort claims. *Travelers Indem.*, 594 A.2d at 47; *Merck & Co.*, 1999 WL 669354, at *15 (determining that Pennsylvania law does not apply because only one factor—one defendant is a Pennsylvania corporation—favors its application). Therefore, the court applies Delaware law to the contract claims regarding the Reorganization Agreement and applies District of Columbia law to the remaining contract claims and the tort claims.

## C. The Court Dismisses the Claims Alleging Violations of the Connecticut Unfair Trade Practices Act: Counts VIII and XVI

The plaintiffs claim that defendants USOP and Ledecky violated the Connecti-

---

7. All parties agree that the most significant relationship test applies to the tort claims. *E.g.*, Pls.' Opp'n (USOP) at 27 n. 16, 51–52; Mot. to Dismiss (USOP) at 39–40, 36 n. 34; Reply (Ledecky) at 20–21.

cut Unfair Trade Practices Act ("CUTPA"). CUTPA provides that "no person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen.Stat. § 42–110b(a). Count VIII alleges CUTPA violations in relation to the Reorganization Agreement, and Count XVI alleges CUTPA violations regarding the February 11 Agreement. As discussed in the court's choice-of-law analysis, however, the law of the District of Columbia, and not the law of Connecticut, is "applicable to the plaintiffs' tort claims." [8] *Travelers Indem.*, 594 A.2d at 47.

The plaintiffs urge the court to apply CUTPA to this situation "[b]ecause CUTPA has more far-reaching remedial powers than does its District of Columbia counterpart...." Pls.' Opp'n (Ledecky) at 28. While this may be true, the plaintiffs fail to allege a significant connection with Connecticut. *Travelers Indem.*, 594 A.2d at 47. As noted, the Delaware choice-of-law principles dictate the application of District of Columbia law, not Connecticut law. *Id.* Thus, as the CUTPA claims are tort claims alleging violations of Connecticut law, the court grants the defendants' motions to dismiss these claims because they fail to state a proper claim. *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683.

## D. The Plaintiffs' Contract and Quasi–Contract Claims: Counts I, IX, XI, XII, and XX

In this section the court addresses the plaintiffs' contract and quasi-contract claims. The court first addresses the claims relating to the Reorganization Agreement and then turns to those relating to the February 11 Agreement. The court denies USOP's motion to dismiss Count I (the breach of contract claim) and

grants USOP's, Mr. Ledecky's, and Mr. Claypoole's motions to dismiss Counts IX, XI, XII, and XX (the breach of contract, unjust enrichment, and promissory estoppel claims).

## 1. The Court Does Not Dismiss the Plaintiffs' Claim That USOP Breached the Reorganization Agreement

Defendant USOP argues that because the breach of contract claim regarding the Reorganization Agreement fails to satisfy Delaware's pleading requirements, the court should dismiss Count I. Mot. to Dismiss (USOP) at 11–13. The plaintiffs clarify which of their allegations apply to the breach of contract claim and assert that the claim satisfies the pleading requirements. Pls.' Opp'n (USOP) at 5–8.

A complaint must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R.CIV.P. 8(a)(2); *Swierkiewicz*, 534 U.S. at 511–14, 122 S.Ct. 992; *see CNW Corp. v. Japonica Partners, L.P.*, 776 F.Supp. 864, 869 (D.Del.1990). To survive a motion to dismiss, a plaintiff claiming a breach of contract "must demonstrate the existence of the contract, breach thereof and resultant damage." *Winston v. Mandor*, 710 A.2d 835, 840 (Del.Ch.1997).

USOP cites a summary-judgment ruling that applies Maryland law to argue that, at this motion to dismiss phase, the plaintiffs must "identify *precisely* how USOP breached the contractual provision at issue." Mot. to Dismiss (USOP) at 11 (emphasis added). USOP has not convinced the court that such exactitude is necessary at this phase of the case. Rather, the plaintiffs' complaint must plainly identify the existence of the contract, the breach,

---

**8.** CUTPA claims sound in tort for choice-of-law purposes. *Bailey Employment Sys., Inc.*

*v. Hahn*, 655 F.2d 473, 476 (2d Cir.1981).

and the resultant damage. *Winston,* 710 A.2d at 843 (denying the defendants' motion to dismiss a complaint when the plaintiff's allegations were more than conclusory); *Swierkiewicz,* 534 U.S. at 511–14, 122 S.Ct. 992.

▮ In their opposition, the plaintiffs demonstrate that Count I satisfies the pleading requirements of Rule 8. Pls.' Opp'n (USOP) at 5–10; *Swierkiewicz,* 534 U.S. at 511–14, 122 S.Ct. 992. While the plaintiffs' method of pleading this count is adequate, it is also confusing. In Count I, the plaintiffs incorporate by reference 50 of the preceding paragraphs and state that "[a]s a result of Defendants' aforementioned acts, USOP has breached the October 24, 1997 Agreement between the parties, with Plaintiffs suffering damages as a result of said breach." Compl. Count I. The plaintiffs' complaint does not specify which portion of the 58-page contract USOP allegedly breached. *Id.* In addition, because the 50 incorporated paragraphs detail multiple acts by the defendants, the complaint fails to indicate which acts constituted the alleged breach. *Id.* The plaintiffs' opposition remedies this confusion by asserting that the contract clause that USOP allegedly breached is Reorganization Agreement § 5.2, which the plaintiffs discuss in paragraph 36 of the complaint. Pls.' Opp'n (USOP) at 5–10. The plaintiffs' opposition also cites to specific portions of the complaint alleging actions that purportedly breach § 5.2 and caused damage to the plaintiffs. *Id.* Because the plaintiff need not present facts demonstrating that they will prevail on the merits, and because Count I demonstrates the existence of the contract, a breach, and resultant damage, Count I adequately alleges a claim for breach of contract. *Swierkiewicz,* 534 U.S. at 511–14, 122 S.Ct. 992; *Winston,* 710 A.2d at 843. Accordingly, the court denies USOP's motion to dismiss Count I.

### 2. The Court Dismisses the Claim for Unjust Enrichment Because a Contract is Alleged

▮ Defendant USOP moves to dismiss Count IX, which alleges that the Reorganization Agreement unjustly enriched USOP by conveying Aztec to USOP without compensating the plaintiffs with Aztec's full reasonable value. Mot. to Dismiss (USOP) at 14; Compl. Count IX. Unjust enrichment is a quasi-contract theory of recovery. *Res. Ventures, Inc. v. Res. Mgmt. Int'l, Inc.,* 42 F.Supp.2d 423, 439–40 (D.Del.1999). Pursuant to Delaware law, when a contract exists, a plaintiff may not pursue an unjust enrichment theory of recovery. *Res. Ventures,* 42 F.Supp.2d at 439–40; *Dalton v. Ford Motor Co.,* 2002 WL 338081, at *6 (Del.Super.Ct. Feb.28, 2002); *Schiff v. Am. Assoc'n of Retired Persons,* 697 A.2d 1193, 1194 n. 2 (D.C.1997) (affirming ruling that because the complaint demonstrated the existence of contracts the court had to dismiss the unjust enrichment claim). Thus, when a complaint alleges the existence of a contract and also claims unjust enrichment, the court shall dismiss the unjust enrichment claim for failure to state a cognizable claim. *Id.* Because the plaintiffs' complaint alleges the existence of a contract—the Reorganization Agreement—the plaintiffs' claim for unjust enrichment regarding USOP's acquisition of Aztec fails to state a cognizable claim. Id.; Compl. ¶¶ 38, 64–65. The court therefore grants USOP's motion to dismiss Count IX.

### 3. The Court Dismisses the Claims for Breach of the February 11 Agreement Because No Contract Exists

▮ As discussed *supra,* the plaintiffs argue that the February 11 Agreement is separate and apart from the Reorganization Agreement. Compl. ¶ 6; Pls.'

Opp'n (Ledecky) at 4. Defendant Ledecky allegedly personally guaranteed USOP's performance of this February 11 Agreement in exchange for the plaintiffs' agreement to refrain from selling their stocks prior to the spin-off of a portion of USOP. Compl. ¶ 112. The plaintiffs include with their complaint two letters that they wrote detailing the February 11 Agreement, the Ledecky letter and the Claypoole letter.[9] *Id.* Exs. A–B. The plaintiffs assert in Counts XI (against USOP) and XII (against Mr. Ledecky) that despite the plaintiffs' demands and reliance, the defendants refused to comply with the February 11 Agreement. Compl. ¶¶ 112–14. In response to these breach of contract allegations, the defendants argue that the breach of contract claim fails to state a proper claim because the parties never reached an agreement. Mot. to Dismiss (USOP) at 26; Mot. to Dismiss (Ledecky) at 5. An enforceable contract exists only if there is "(1) agreement as to all material terms; and (2) intention of the parties to be bound." *Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C.1995) (citations and quotation marks omitted). "Vagueness of expression, indefiniteness and uncertainty as to any of the essential terms of an agreement, have often been held to prevent the creation of an enforceable contract." *Rosenthal v. Nat'l Produce Co., Inc.*, 573 A.2d 365, 369–70 (D.C. 1990) (quoting 1 A. Corbin, Corbin on Contracts § 95, at 394 (1963)). The terms of a contract must be definite enough that a court can identify the obligations that it should enforce. *Id.* at 370.

 To have a meeting of the minds, there must be a mutual agreement as to the substance and terms of a contract. *Jack Baker*, 664 A.2d at 1238;

*Owen v. Owen*, 427 A.2d 933, 937 (D.C. 1981). Material terms include price, payment terms, duration, and the identity of the parties involved. *Id.; Anchorage–Hynning & Co. v. Moringiello*, 697 F.2d 356, 363–64 (D.C.Cir.1983) (applying District of Columbia law). Without agreement as to the parties or terms, there is no way of knowing who is bound by the contract or what they are required to do. *Id.* Finally, "if there is a discrepancy between the terms of an instrument annexed to a pleading and its interpretation in the pleading, the former must prevail." *Munter v. Lankford*, 127 F.Supp. 630, 633 (D.D.C.1955) (stating that this is an elementary rule); *see also ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 n. 8 (3d Cir.1994).

 A court can dismiss claims for failure to state a claim on which relief can be granted when the complaint includes facts demonstrating that success on the merits is impossible—in other words, when the plaintiffs "plead [themselves] out of court." *Sparrow*, 216 F.3d at 1116. Although the defendants point out the contradictions between the plaintiffs' description of the February 11 Agreement in (1) the complaint, (2) the Claypoole letter, and (3) the Ledecky letter, the plaintiffs barely address these arguments. Mot. to Dismiss (Ledecky) at 13–16; Mot. to Dismiss (USOP) at 27–30; Pls.' Opp'n (Ledecky) at 12, 18; Pls.' Opp'n (USOP) at 34. The plaintiffs state only that whether the letters "contained all of the terms of the contract is not determinative" and that the "inconsistencies highlighted by LEDECKY relate to [sic] not to what the parties agreed, but only to how the agreed

---

9. For the purposes of this motion, the court accepts the plaintiffs' contention that the Ledecky and Claypoole letters are a "memorialization" of the alleged agreement reached on

February 11. Pls.' Opp'n (Ledecky) at 12; Pls.' Opp'n (USOP) at 33; *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683.

results would be managed." Pls.' Opp'n (Ledecky) at 18.

■ One problem with the alleged contract or promise is that the complaint and the Ledecky and Claypoole letters describe the parties, debtors, and calculation of the debt differently. First, the Ledecky and Claypoole letters vary the identity of the alleged contract's parties and debtors. Compl. Exs. A–B. The complaint states that the contract binds the plaintiffs, USOP, and Mr. Ledecky and states that the latter two parties will compensate the plaintiffs. *Id.* ¶ 56. However, the Ledecky letter states that "[o]ur understanding is that *Aztec Technology*[10] will provide Phil Arturi, Bruce Torello, Jack Meehan, and the Aztec International shareholders with exercisable stock options . . . ." Compl. Ex. B (emphasis added). This letter does not mention a personal guarantee by Mr. Ledecky or an obligation by USOP. *Id.* This contradiction within the complaint shows that a critical material term—namely, the identity of the debtors—was not sufficiently definite. *Rosenthal,* 573 A.2d at 369–70 (stating that material terms to a contract cannot be indefinite); *Jack Baker,* 664 A.2d at 1238.

A second contradiction exists regarding the *method used to calculate the amount of* money or stock options that the debtor would owe the plaintiffs. The plaintiffs first detail the expected payment as the price differential between the Merger Consideration, as defined in the Reorganization Agreement, and the stock valued at the end of closing on the trigger date (the point when the parties will calculate the value of the plaintiffs' USOP stock). *Id.* ¶ 56, Ex. A. The complaint and the Claypoole letter seem to rely on the spin-off date, April 25, 1998, as the trigger date; while the Ledecky letter relies on a date, September 7, 1998, anticipated to be 90 days after a later spin-off date. *Id.* ¶ 56, Exs. A–B. Again, the plaintiffs vary a material term of the alleged contract. *Rosenthal,* 573 A.2d at 369–70; *Jack Baker,* 664 A.2d at 1238 (explaining that for a contract to exist, the parties must agree to all of its material terms).

■ In addition to these contradictions, the Ledecky letter demonstrates indefiniteness by referring to the contract as a proposal, stating "we are open to *alternative* measures within this ninety-day window to achieve this if you feel the stock option *proposal* is unworkable for any reason" and "[i]f our *understanding differs* from yours, please let us know as soon as possible." *Id.* Ex. B (emphasis added). Critical to the formation of an oral contract is that all parties intend to be bound by their oral agreement. *Jack Baker,* 664 A.2d at 1238. The Ledecky letter indicates that the plaintiffs did not assume that Mr. Ledecky intended to be bound by the alleged February 11 Agreement. Compl. Ex. B. Furthermore, Mr. Claypoole's alleged statement that the parties should not enter into a formal written agreement and that Mr. Ledecky would not at that time accept a letter detailing the agreement also indicate that the defendants did not intend to be bound by any agreement.[11] Compl. ¶ 57.

**10.** Aztec Technology ("New Aztec") was created in June 1998 as a USOP spin-off during USOP's restructuring. Compl. ¶ 45, Ex. B. Before the spin-off, New Aztec was the original Aztec that the plaintiffs sold to USOP. *Id.*

**11.** This conclusion is especially strong when considered in light of the Reorganization Agreement's prohibition of oral modifications.

Reorganization Agreement § 10.2. Regardless of whether the February 11 Agreement is a modification of the Reorganization Agreement or is a separate and distinct contract, the plaintiffs must have known that the agreement *could* be construed as a prohibited oral modification. *Jack Baker,* 664 A.2d at 1238 (requiring an intent to be bound by the contract).

In sum, the February 11 Agreement is indefinite and its terms are contradictory. For the parties to be bound by their oral agreement, the agreement must show an intent to be bound, must contain all material terms, and must not be vague or indefinite. *Rosenthal*, 573 A.2d at 369–70; *Jack Baker*, 664 A.2d at 1238. The February 11 Agreement is not complete, as demonstrated by the Claypoole and Ledecky letters wherein the plaintiffs vary the material terms, and does not indicate an intent to be bound, as demonstrated by the use of the words "proposal" and "alternative measures" in the Ledecky letter. *Id.;* Compl. ¶¶ 54–61, Exs. A–B. Thus, the court grants the motions of defendants USOP and Ledecky to dismiss these breach of contract claims because the complaint demonstrates that no facts could entitle the plaintiffs to relief for these claims. *Sparrow*, 216 F.3d at 1116; *Conley*, 355 U.S. at 46–47, 78 S.Ct. 99.

### 4. The Court Dismisses the Claim for Promissory Estoppel Because There is No Clear and Definite Promise

In response to the plaintiffs' promissory estoppel claim regarding the February 11 Agreement, the defendants argue that given the facts plead by the plaintiffs, no promise could have existed and thus the promissory estoppel claim fails to state a proper claim. Mot. to Dismiss (USOP) at 26; Mot. to Dismiss (Ledecky) at 5. The plaintiffs counter that the facts in the complaint do allege a definite promise and the plaintiffs reasonably relied on this promise. Pls.' Opp'n (Ledecky) at 20–21.

To establish a promissory estoppel claim, the plaintiffs must show (1) a promise; (2) that the promise reasonably induced reliance on it; and (3) that the promisee relied on the promise to his or her detriment. *Simard v. Resolution Trust Corp.*, 639 A.2d 540, 552 (D.C.1994)

(citing *Choate v. TRW, Inc.*, 14 F.3d 74, 77 (D.C.Cir.1994) (explaining that an assurance is not a promise)). The promise must be definite, as reliance on an indefinite promise is not reasonable. *Granfield v. Catholic Univ. of Am.*, 530 F.2d 1035, 1040 (D.C.Cir.1976); *In re Phillips Petroleum Secs. Litig.*, 881 F.2d 1236, 1250 (3d Cir. 1989). Finally, though a promise need not be as specific and definite as a contract, it must still be a promise with definite terms on which the promisor would expect the promisee to rely. *Bender v. Design Store Corp.*, 404 A.2d 194, 196 (D.C.1979) (citing *Granfield*, 530 F.2d at 1040).

As discussed *supra*, the court has determined that the February 11 Agreement is not an enforceable contract because the terms and identity of the primary debtor are unclear and the agreement is vague and indefinite. Part III.D.3 *supra;* Compl. ¶¶ 54–63, Exs. A–B. For these reasons-which are explained in the previous subsection of this opinion—the plaintiffs' complaint, including the attached Ledecky and Claypoole letters, provides so many facts that it demonstrates that the promise was neither clear nor definite. *Sparrow*, 216 F.3d at 1116; *Simard*, 639 A.2d at 552 (stating that vagueness of terms negate the inference that a promise of employment existed).

The promissory estoppel claim also fails because the plaintiffs could not have reasonably relied on the statements, and the defendants would not expect reliance, when the statements varied how their compensation would be calculated and who the primary debtor was. Compl. ¶¶ 54–63, Exs. A–B; *Granfield*, 530 F.2d at 1040–41 (affirming ruling that statements were too confusing and contradictory to form a promise); *In re Phillips Petroleum Secs. Litig.*, 881 F.2d at 1250 (reliance on an indefinite promise is not reasonable). Reliance on the oral statements is also unrea-

sonable given that the parties were aware that the Reorganization Agreement could bar oral modifications and the defendants explicitly refused to commit to the agreement in writing. Compl. ¶ 57; Reorganization Agreement § 10.2; *Bender*, 404 A.2d at 196 (explaining that no promise existed when the agreement was not in writing and the appellees had expressed that no agreement would exist until the parties signed a lease). Accordingly, the court grants the motions by defendants Ledecky and USOP to dismiss Count XX for failure to state a cognizable claim. *Sparrow*, 216 F.3d at 1116; *Conley*, 355 U.S. at 47, 78 S.Ct. 99.

### E. The Court Dismisses the Claim for Negligent Failure to Notify the Plaintiffs that the Restrictions on the Sale of Their Stock Had Terminated: Count X

■ In Count X (negligence) the plaintiffs charge that USOP had a duty to notify the plaintiffs upon the termination of the restrictions on the sale of their USOP stock. Compl. ¶ 103. The plaintiffs also allege that USOP had a duty to verify that the plaintiffs received the notification, "especially as [USOP] had sent said notifications to similarly situated shareholders." *Id.* According to the plaintiffs and USOP, when USOP attempted to notify the plaintiffs of the termination of the restrictions, it sent the notice to the wrong facsimile number. *Id.* ¶ 104; Mot. to Dismiss (USOP) at 22, 23 n. 20. USOP argues that it had no legal duty to notify the plaintiffs regarding the termination of these restrictions or to verify that the plaintiffs re-

ceived the notice. Mot. to Dismiss (USOP) at 24.

[27–29] The elements of a negligence claim are (1) a duty of care; (2) a breach of that duty; and (3) damage to the plaintiff proximately caused by the breach of duty. *Dist. of Columbia v. Cooper*, 483 A.2d 317, 321 (D.C.1984); *see also Trifax Corp. v. Dist. of Columbia*, 53 F.Supp.2d 20, 29 (D.D.C.1999) (applying District of Columbia law and granting a defendant's motion to dismiss a negligence claim when the plaintiff could not demonstrate the existence of a duty). As the existence of a legal duty is an essential element of a negligence claim under District of Columbia law, the complaint must specify the negligent act and "characterize the duty whose breach might have resulted in negligence liability." *Dist. of Columbia v. White*, 442 A.2d 159, 162 (D.C.1982); *see also Pied Piper, Inc. v. Datanational Corp.*, 901 F.Supp. 212, 215 (S.D.W.Va. 1995) (dismissing negligence claim for failure to state a claim because the plaintiff failed to establish the existence of a legal duty between two business entities dealing with each other at arm's length [12]). The complaint may not rest on mere "conclusory assertions" regarding the existence of a duty. *White*, 442 A.2d at 162.

In response to USOP's contention that it had no legal duty to notify the plaintiffs of the termination of the restrictions of sale, the plaintiffs assert only that USOP had a duty to notify them because USOP notified other similarly situated shareholders of this termination. Pls.' Opp'n (USOP) at 28–29. The cases that the plaintiffs rely

---

12. An arm's-length transaction is a transaction negotiated by unrelated parties who have roughly equal bargaining power and act in their own self interest. Black's Law Dictionary (7th ed.1999). Some jurisdictions have determined that no duty can exist between parties to an arm's-length business transaction. *Pied Piper*, 901 F.Supp. at 215; *G & M*

Oil Co. v. Glenfed Fin. Corp., 782 F.Supp. 1085, 1089 (D.Md.1991); *Safeco Ins. Co. v. Dain Bosworth Inc.*, 531 N.W.2d 867, 871 (Minn.Ct.App.1995) (describing cases from a number of jurisdictions holding that no duty exists between parties to an arm's-length business transaction).

on for this argument all involve situations where one party promises or in some way notifies another party that it has gratuitously undertaken a duty and the other party *is aware of this undertaking and relies upon it. E.g. Franklin Inv. Co. v. Huffman*, 393 A.2d 119, 122–23 (D.C.1978); *Dawson v. Nat'l Bank & Trust Co.*, 335 A.2d 259, 261 (D.C.1975) (explaining that the *notice* of the gratuitous undertaking made the tenant aware that the owner's agent had undertaken the responsibility of maintaining the premises). Here, the plaintiffs' argument that USOP created a duty to notify the plaintiffs of the lifting of the restrictions when it notified other shareholders fails because the plaintiffs do not assert that they *knew* that USOP had so notified other shareholders. Compl. ¶¶ 51–53, Count X; Pls.' Opp'n (USOP) at 27–30. Similarly, at no point do the plaintiffs allege that they had any reason to rely on the possibility that USOP would notify them when the restrictions terminated. *Id.*

Neither the facts alleged in the plaintiffs' complaint nor the plaintiffs' arguments are sufficient to demonstrate that USOP had a duty to notify the plaintiffs of the termination of the restrictions on the sale of the plaintiffs' USOP stock. *White*, 442 A.2d at 162. As USOP had no duty to notify the plaintiffs, and breach of duty is an element of negligence, USOP cannot be negligent for failing to notify the plaintiffs. *Cooper*, 483 A.2d at 321; *White*, 442 A.2d at 162. Therefore, the court grants defendant USOP's motion to dismiss Count X for failure to state a cognizable claim. *Trifax Corp.*, 53 F.Supp.2d at 29; *Hishon*, 467 U.S. at 73, 104 S.Ct. 2229.

## F. The Court Dismisses the Claims of Misrepresentation and Fraud: Counts II–V, XIV–XV, and XVIII–XIX

In the context of the Reorganization Agreement, the plaintiffs allege four tort claims: fraud, negligent misrepresenta-

tion, fraudulent inducement to enter into a contract, and inducement by material misrepresentation to enter into a contract. Compl. Counts II–V. These claims all allege that the plaintiffs entered into the Reorganization Agreement as a result of their reliance on false or misleading information from the defendants. *Id.* The plaintiffs also allege the same four violations regarding the February 11 Agreement. *Id.* Counts XIV–XV, XVIII–XIX. Addressing the defendants' motions to dismiss the misrepresentation and fraud counts, the court first discusses the general requirements for misrepresentation and fraud claims. Next, the court dismisses the claims of inducement to enter the February 11, 1998 contract for failure to state a claim on which relief can be granted because no such contract exists. The court also dismisses the four misrepresentation and fraud claims regarding the Reorganization Agreement for failure to state a claim because the Reorganization Agreement's Integration Clause bars these claims. Last, the court dismisses without prejudice the two remaining claims regarding the February 11 Agreement for failure to properly plead reasonable reliance.

### 1. Legal Standard for Negligent Misrepresentation and Fraud

#### a) Elements

▮▮▮▮▮ Under District of Columbia law, a claim for negligent misrepresentation requires a showing that (1) the defendant made a false statement or omission of a fact, (2) the statement or omission was in violation of a duty to exercise reasonable care, (3) the false statement or omission involved a material issue, (4) the plaintiffs reasonably and to their detriment relied on the false information, and (5) the defendant's challenged conduct proximately caused injury to the plaintiffs. *Appleton v.*

*United States*, 2001 WL 45473, at *3 (D.D.C. Jan.5, 2001) (citing *Redmond v. State Farm Ins. Co.*, 728 A.2d 1202, 1207 (D.C.1999)); *Steele v. Isikoff*, 130 F.Supp.2d 23, 34 (D.D.C.2000); *Remeikis v. Boss & Phelps, Inc.*, 419 A.2d 986, 990 (D.C.1980). Similarly, a fraud claim requires a showing that (1) the defendant made a false representation, (2) the representation was in reference to a material fact, (3) the defendant had knowledge of its falsity, (4) the defendant intended to deceive, (5) the plaintiffs acted in reliance on the misrepresentation, and (6) the reliance was reasonable.[13] *R & A, Inc. v. Kozy Korner, Inc.*, 672 A.2d 1062, 1066 (D.C.1996); *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 923 (D.C.1992). The elements of fraud and fraudulent inducement are the same.[14] *Synergistic Techs., Inc. v. IDB Mobile Communications, Inc.*, 871 F.Supp. 24, 30 (D.D.C. 1994).

### b) Pleading Requirements

▮▮▮ Federal Rule of Civil Procedure 9(b) requires that all averments of fraud or mistake state the circumstances constituting fraud with particularity. In contrast, Rule 8 states that a claim for relief need contain only a "short and plain statement of the claim showing that the pleader is entitled to relief." The complaint, to comply with Rules 8 and 9(b), must state the time, place and content of the misrepresentations, the facts misrepresented, and what the plaintiffs lost or retained as a consequence of the misrepresentations. *Kowal*, 16 F.3d at 1278 (providing the pleading requirements for securities fraud). Rule 9(b) is intended to prevent the filing of complaints as a "pretext for the discovery of unknown wrongs." *Id.* at 1279 n. 13. Accordingly, fraud claims must plead facts capable of establishing each of the requisite elements of fraud. *Hercules*, 613 A.2d at 933. "Allegations in the form of conclusions on the part of the pleader as to the existence of fraud are insufficient." *Id.* at 923.

▮▮▮ Plaintiffs alleging false and misleading projections or statements of optimism must plead facts that, if true, would prove that the defendant lacked a reasonable basis for its projections or issued them in less than good faith. *Kowal*, 16 F.3d at 1278. Successful past performance undermines the inference that statements of optimism lack a reasonable basis. *Id.* Merely alleging that the defendant lacked a basis in fact is a conclusory assertion and is therefore insufficient. *Id.* Rather, the complaint must allege facts demonstrating *why* there is a lack of basis in fact. *Id.* In addition, allegations of fraud must address each defendant individually and plead each instance of fraud with particularity. *In re Newbridge Networks Secs. Litig.*, 962 F.Supp. 166, 170–71 (D.D.C.1997).

**13.** This last element is required only in cases involving commercial contracts negotiated at arm's length. *Hercules & Co. v. Shama Rest. Corp.*, 613 A.2d 916, 923 (D.C.1992). While the reasonableness of reliance can be an issue of fact, dismissal for failure to state a claim is proper when no reasonable person would have relied on the representation. *Alicke v. MCI Communications Corp.*, 111 F.3d 909, 912 (D.C.Cir.1997) (applying District of Columbia law).

**14.** The court cannot provide elements for inducement by material misrepresentation, the cause of action alleged in Counts V and XIX, because the plaintiffs provides no District of Columbia law describing the elements this cause of action and the court has found no such law. Pls.' Opp'n (Ledecky) at 23–27; Pls.' Opp'n (USOP) at 17–26, 48–50; Pls.' Opp'n (Claypoole) at 15–16. Several District of Columbia cases use the terms "fraudulent inducement" and "inducement involving misrepresentation" interchangeably, thus, if the latter is a cause of action, it appears to be identical to fraudulent inducement. *Hercules*, 613 A.2d at 925; *Haynes v. Kuder*, 591 A.2d 1286, 1290 n. 5 (D.C.1991).

In many jurisdictions, plaintiffs claiming fraud or negligent misrepresentation must present specific allegations of reasonable reliance on the misrepresentations by *each* plaintiff for each claim. *In re Newbridge Networks Secs. Litig.*, 926 F.Supp. 1163, 1175 (D.D.C.1996) (stating that this rule exists in many jurisdictions, but not citing to District of Columbia law). At the very least, negligent misrepresentation claims, as with fraud claims, must adequately allege *all* of the required elements, including allegations that the plaintiff reasonably relied on the alleged misrepresentation.[15] *Alicke v. MCI Communications Corp.*, 111 F.3d 909, 912 (D.C.Cir.1997) (applying District of Columbia law to dismiss claims of fraud and negligent misrepresentation); *Smith v. Washington Metro. Area Transit Auth.*, 1997 WL 182286, at *5 (D.D.C. Apr.4, 1997) (same). In the commercial context, not only must the plaintiffs plead reasonable reliance, but the plaintiffs must plead reliance that is objectively reasonable. *Id.; Hercules*, 613 A.2d at 923, 933.

## 2. The Claims for Inducement to Enter a Contract by Fraud or Misrepresentation Fail Because They Require the Existence of a Contract

Both Count XVIII (fraudulent inducement to enter a contract) and Count XIX (inducement to enter a contract by material misrepresentation) assume that the alleged February 11 Agreement is a contract. Fraudulent inducement to enter a contract requires a misrepresentation or omission that pertains to an essential term of a contract and the intent to convince a plaintiff to enter the contract. *Haynes*, 591 A.2d at 1290 n. 5. As the court has already determined that the February 11 Agreement is not a contract, no claims requiring inducement to enter this contract can exist. *Id.* Therefore, the court must grant the defendants' motions to dismiss these counts for failure to state a claim upon which relief can be granted. *Hishon*, 467 U.S. at 73, 104 S.Ct. 2229.

## 3. The Integration Clause in the Reorganization Agreement Bars the Fraud and Misrepresentation Claims Regarding the Reorganization Agreement

Defendants USOP and Claypoole move to dismiss Counts II–V (the fraud and misrepresentation claims pertaining to the Reorganization Agreement) for failure to state a claim on which relief can be granted. Mot. to Dismiss (USOP) at 15; Mot. to Dismiss (Claypoole) at 5–6. The plaintiffs claim that they entered the Reorganization Agreement in reliance on fraudulent and negligently misrepresented statements. Compl. Counts II–V. These misrepresentations, however, are not in the Reorganization Agreement. Because the Reorganization Agreement contains an integration clause, any statement that is not in the Reorganization Agreement cannot be material and the court must deem the statement abandoned. *Hercules*, 613 A.2d at 929, 933 (dismissing a claim for fraudulent inducement to enter a contract that relied on representations not included in the contract when the contract included an integration clause).

---

15. Similar to the requirements for pleading fraud claims, "failure to meet the pleading requirements of Rule 9(b) may also be fatal to plaintiffs claims of negligent misrepresentation." *Shields v. Washington Bancorporation*, 1992 WL 88004, at *9 (D.D.C. Apr.7, 1992) (citing *Marra v. Burgdorf Realtors, Inc.*, 726 F.Supp. 1000, 1007 (E.D.Pa.1989) (applying Pennsylvania law)); *Nelson v. Nationwide Mortgage Corp.*, 659 F.Supp. 611, 618 (D.D.C. 1987) (requiring the plaintiff to allege claims of negligent misrepresentation with particularity).

When parties are negotiating at arm's length, each side presumably can condition their contractual agreement on the inclusion of representations that each side deems material. *Id.* at 932–34. Unless the plaintiffs allege that the representation omitted from the contract was omitted by fraud, mistake or accident, an integration clause bars representations not contained in the contract even when the plaintiffs allege fraudulent inducement to enter the contract. *Whelan v. Abell,* 48 F.3d 1247, 1258 (D.C.Cir.1995) (barring alleged oral promises as to future behavior that were not included in a contract) (citing *One–O–One Enters. v. Caruso,* 848 F.2d 1283, 1287 (D.C.Cir.1988) (applying District of Columbia law)); *Hercules,* 613 A.2d at 930–33. This prohibition is especially applicable when the plaintiffs have both the capacity and the opportunity to read the written contract, and when they execute it in the absence of any emergency or trick. *One–O–One Enters. v. Caruso,* 848 F.2d 1283, 1287. The reasoning underlying this rule is that if a statement is material or if a party relies on the statement, then the party will include it in the contract. *Hercules,* 613 A.2d at 929, 933.

Subsection 10.2 of the Reorganization Agreement appears in section 10, which the parties labeled as the "General" section. Reorganization Agreement i-iv, § 10. Subsection 10.2 states that "[a]ny and all previous agreements and understandings between or among the parties regarding the subject matter hereof, whether written or oral, are superseded by this agreement" and that any modification of this agreement must be in writing.[16] Reorganization Agreement § 10.2. Consequently, because

any statement relating to but not contained in the Reorganization Agreement cannot be material, the facts not in the Reorganization Agreement are legally immaterial. *Hercules,* 613 A.2d at 929. In addition, reliance on any facts not in the Reorganization Agreement is not reasonable because such reliance contravenes the written instrument. *Id.*

The parties agree that Counts II–V are based on representations—such as statements regarding plans for USOP's future behavior, its business plan, and its future use of pooling transactions—outside of the Reorganization Agreement. Mot. to Dismiss (USOP) at 15; Mot. to Dismiss (Claypoole) at 5–6; Pls.' Opp'n (USOP) at 16; Pls.' Opp'n (Claypoole) at 7. The plaintiffs have not argued that representations supporting these claims are in the Reorganization Agreement. Pls.' Opp'n (USOP) at 15–17; Pls.' Opp'n (Claypoole) at 7. Thus, the integration clause bars the court from considering the representations required to prove Counts II–V. *Whelan,* 48 F.3d at 1258; *Hercules,* 613 A.2d at 929, 933. Because no facts exist that could support the theories of liability in these counts, the court grants the motions of defendants USOP and Claypoole to dismiss Counts II–V for failure to state cognizable claims. *Hishon,* 467 U.S. at 73, 104 S.Ct. 2229.

### 4. The Claims for Fraud and Misrepresentation Regarding the February 11 Agreement Fail Because the Plaintiffs Did Not Adequately Plead Reasonable Reliance

The court now turns to the defendants' argument that the court should dismiss Counts XIV, XV, XVIII, and XIX (the

---

**16.** The plaintiffs argue that § 8.4 of the Reorganization Agreement trumps the integration clause in the "General" section and permits the survival of representations not included in the Reorganization Agreement. Pls.' Opp'n (USOP) at 16. Subsection 8.4 is in a section

labeled "Indemnification" that outlines the plaintiffs' obligations to indemnify USOP. A review of the Reorganization Agreement as a whole demonstrates that § 8.4 has no effect on § 10.2. Conversely, however, § 10.2 most likely limits § 8.4.

fraud and misrepresentation claims pertaining to the February 11 Agreement) because, first, reasonable and detrimental reliance cannot exist and, second, the plaintiffs fail to adequately allege reasonable reliance. Mot. to Dismiss (USOP) at 35, 38; Reply (USOP) at 9 n. 6, 25; Mot. to Dismiss (Ledecky) at 24–30; Reply (Ledecky) at 16 n. 9; Mot. to Dismiss (Claypoole) at 10–11; Reply (Claypoole) at 8. Because the court has dismissed all of the plaintiffs' fraud and misrepresentation claims except for Counts XIV and XV, the court considers the remaining arguments for these two counts only.

### a) Counts XIV and XV State a Claim Upon Which Relief Could Be Granted

The court first addresses the arguments of defendants Ledecky and Claypoole that the court should dismiss Counts XIV and XV for failure to state a claim. Mot. to Dismiss (Ledecky) at 24–27; Mot. to Dismiss (Claypoole) at 10 (incorporating this argument). The defendants argue that, as a matter of law, the plaintiffs could not have detrimentally relied on the defendants' February and March 1998 representations because they must have known that the February 11 Agreement did not constitute a contract. Mot. to Dismiss (Ledecky) at 27. The defendants also argue that the plaintiffs' decision to refrain from selling their USOP stock was not due to the February 11 Agreement, but rather in response to defendant Ledecky's optimistic statements about USOP's future performance. *Id.* The facts and procedural posture of this case, however, are sufficiently different from those in the cases on which the defendants rely. *Id.* at 25–27.

For example, in *Hyman v. First Union Corp.*, the plaintiffs claimed that the defendants contracted to give the plaintiffs priority consideration for certain employment positions. 982 F.Supp. 8, 10–14 (D.D.C. 1997). The court granted the defendants'

motion for summary judgment on the plaintiffs' contract claims, ruling that no contract existed. *Id.* at 12. The court explained that one reason why no contract existed was that the plaintiffs never alleged detrimental reliance on the statement regarding priority consideration. *Id.* at 14. In another case cited by defendant Ledecky, the defendant terminated a subcontract for plumbing and heating work before the work was finished. *Klingensmith v. Dist. of Columbia,* 370 A.2d 1341, 1342 (D.C.1977). The plaintiff and the defendant attempted to settle their dispute informally. *Id.* The plaintiff sent to the defendant a letter outlining the plaintiff's understanding of an agreement the parties had reached at a meeting regarding the amount of money the defendant would pay to the plaintiff's subcontractor. *Id.* The defendant never responded to the letter and failed to comply with the terms of the letter. *Id.* Ruling that no contract existed, the court explained that the facts presented during the trial demonstrated that the plaintiff had not relied to his detriment on the representations of the defendant. *Id.* at 1344.

Both of these cases involve rulings on the merits and determinations that the plaintiffs did not detrimentally rely on the defendants' statements. *Id.; Hyman,* 982 F.Supp. at 14. Here, the court cannot rule on the merits of the case and the court must generally accept the complaint's factual assertions as true. *Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683. The plaintiffs in the case at bar specifically allege that they relied on the statements of defendant Ledecky and Claypoole to their detriment by doing what the defendants asked them to do: delaying the sale of their USOP stock. Compl. ¶¶ 59, 63. Thus, contrary to the defendants' arguments that the plaintiffs did not rely on defendant Ledecky's February 11, 1998 statements, the court must accept the plaintiffs' assertions of detri-

mental reliance. *Id.; Scheuer,* 416 U.S. at 236, 94 S.Ct. 1683. Consequently, the court denies defendant Claypoole's and Ledecky's motions to dismiss Counts XIV and XV for failure to state a claim. *Hishon,* 467 U.S. at 73, 104 S.Ct. 2229.

### b) The Plaintiffs Did Not Adequately Plead Reliance

 The court now turns to the argument advanced by all three defendants that the plaintiffs have not adequately plead reasonable reliance. Mot. to Dismiss (USOP) at 35, 38; Reply (USOP) at 9 n. 6, 25; Mot. to Dismiss (Ledecky) at 28–30; Reply (Ledecky) at 16 n. 9; Mot. to Dismiss (Claypoole) at 10–11; Reply (Claypoole) at 8. For this analysis the court applies the case law discussed in the legal standard for negligent misrepresentation and fraud. Part III.F.1 *supra.* Because the parties' relationship is commercial, District of Columbia law requires the fraud and negligent misrepresentation claims to include allegations of reliance that are objectively reasonable. *Alicke,* 111 F.3d at 912; *Hercules,* 613 A.2d at 923, 933.

Construing the complaint in the plaintiffs' favor, the court considers several facts regarding the February 11 Agreement that are critical to the court's reliance analysis: defendant Ledecky claimed that he knew the stock prices would increase, defendant Ledecky stated that defendant Ledecky or USOP would compensate the plaintiffs for the loss in value of their USOP stock, the method and amount of compensation was unclear, the agreement was oral, the defendants refused to sign a written agreement, the defendants told the plaintiffs that the agreement was confidential, and the Reorganization

Agreement prohibits oral modifications. Compl. ¶¶ 55–60; Reorganization Agreement § 10.2; *Hercules,* 613 A.2d at 933–34. The District of Columbia Court of Appeals has explained that "[o]ne cannot close his eyes and blindly rely upon the assurances of another absent some fiduciary relationship or emergency. . . ." *Hercules,* 613 A.2d at 934. Here, the parties had a commercial and arm's-length, not a fiduciary, relationship.[17] Also, the court has already determined that the statements were too indefinite and contradictory to create a promise or contract. Part III.D *supra.* In light of the facts set forth in this paragraph, the plaintiffs' reliance on the alleged misrepresentations regarding the compensation by the defendants resembles blind reliance and not objectively reasonable reliance. *Hercules,* 613 A.2d at 934; *Alicke,* 111 F.3d at 912 (holding that reliance was unreasonable because even though all long-distance calls were billed by the defendant in whole-minute increments, "no reasonable customer could actually believe that each and every phone call she made terminated at the end of a full minute"); *Kowal,* 16 F.3d at 1278.

Further evaluating the reasonableness of the reliance, the court considers § 10.2 of the Reorganization Agreement that requires any modification of the Reorganization Agreement to be in writing and executed by each of the parties to the agreement. The February 11 Agreement was oral and did not include all of the parties to the Reorganization Agreement. Compl. ¶¶ 54–62. The plaintiffs were aware of § 10.2 as they signed the contract after negotiating, drafting, and reviewing it with their legal counsel. Reorganization Agreement §§ 10.11–10.12.

---

**17.** Facts in the Reorganization Agreement demonstrate that the Reorganization Agreement was an arm's-length transaction: the plaintiffs were represented by legal counsel during the negotiation and execution of the contract, and the contract was the mutual product of the consultation, negotiation, and agreement of the parties to the agreement. Reorganization Agreement §§ *10.11–10.12.*

District of Columbia courts have ruled that no reasonable trier of fact could conclude that a plaintiff reasonably relied on oral representations contradicted by express written provisions. *Hercules,* 613 A.2d at 934 (determining that reliance on statements contradicted by the contract and not in the contract was unreasonable); *Smith,* 1997 WL 182286, at *5 (holding that no reasonable trier of fact could conclude that the plaintiff reasonably relied on oral representations of his superior that were contradicted by the express written provisions of the manual governing employment). Though the plaintiffs were aware of § 10.2, and though the February 11 Agreement allegedly modified the Merger Consideration that USOP would pay to the plaintiffs, the plaintiffs have plead no facts to demonstrate why a reasonable person would be so certain that the February 11 Agreement was outside of the scope of § 10.2 that they would detrimentally rely on this conclusion.

The plaintiffs argue that they have set forth the fraud and negligent misrepresentation claims with sufficient particularity by pleading, "the speaker, the place of the representations, the content and manner in which they were made." Pls.' Opp'n (USOP) at 49 (citing Compl. ¶¶ 52–63). The plaintiffs seem to overlook the requirement that these counts allege *objectively reasonable* reliance. *Hercules,* 613 A.2d at 933–34. For these reasons, the court grants the defendants' motions to dismiss Counts XIV and XV for failure to properly plead reasonable reliance.[18] *Hercules,* 613 A.2d at 933; *Alicke,* 111 F.3d at 912. To the extent the defendants' motions move for dismissal of these counts *with* prejudice, the court denies the mo-

tions for the reasons set forth in the following subsection.

### 5. The Court Grants the Plaintiffs' Request for Leave to Amend Their Complaint

Acknowledging that the court might grant the defendants' motions to dismiss the fraud and misrepresentation claims for pleading deficiencies, the plaintiffs argue that the court should grant them leave to amend their complaint instead of dismissing the claims outright. Pls.' Opp'n (Ledecky) at 27; Pls.' Opp'n (Claypoole) at 12 n. 7; Pls.' Opp'n (USOP) at 23 n. 13.

 Denying leave to amend is an abuse of discretion unless the court provides a sufficiently compelling reason, such as "undue delay, bad faith, or dilatory motive . . . repeated failure to cure deficiencies by [previous] amendments [or] futility of amendment." *Firestone v. Firestone,* 76 F.3d 1205, 1208 (D.C.Cir.1996) (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). Courts almost always grant leave to amend when the complaint fails to properly plead fraud claims. *Id.* at 1209. A plaintiff who seeks leave to amend a complaint challenged pursuant to Federal Rule of Civil Procedure 9(b) must indicate the grounds for the motion for leave pursuant to Rule 15(a), demonstrate that the amended complaint remedies the insufficient pleading of the earlier complaint, and attach the proposed pleading as required by Local Civil Rule 7.1(i). *Kowal,* 16 F.3d at 1280 & n. 4.

 In this case, several facts could support a denial of the plaintiffs' request for leave to amend their complaint. *Kowal,* 16 F.3d at 1280 & n. 4 (affirming trial court's denial of leave to amend after dis-

---

18. As the court has already dismissed the fraud and misrepresentation counts, the court need not reach the defendants' additional ar-

guments that the plaintiffs failed to plead the fraud and misrepresentation claims with sufficient particularity.

missing complaint pursuant to Rule 9(b) when the trial court's decision was rendered 13 months after the filing of the motion to dismiss and the plaintiffs had failed to submit a proposed amendment). The first such fact is that the plaintiffs have previously amended their complaint and failed to cure its deficiencies. *Firestone*, 76 F.3d at 1208; *see also Shields*, 1992 WL 88004, at *5 (stating that outright dismissal is reserved for extreme situations such as when the pleader has had a previous opportunity to cure deficiencies). Second, since September 13, 1999, when the defendants filed the motions to dismiss, the plaintiffs have not filed a proper motion for leave to amend their complaint with an amended complaint attached. *Id.; see also* LcvR 7.1(i) (requiring a request to amend a complaint to include the proposed amendment).

Despite these errors, the court grants the plaintiffs' request for leave to amend their complaint to correct the pleading errors in Counts XIV and XV. This circuit requires trial courts to grant leave to amend liberally, especially when a complaint is dismissed for pleading deficiencies. *Firestone*, 76 F.3d at 1208–09. Accordingly, if facts exist that can remedy the deficiencies of the Second Amended Complaint, then the plaintiffs may file an amended complaint that includes Count I

and new versions of Counts XIV and XV. To avoid confusion regarding which statements are contextual and which are the alleged false statements,[19] the court directs the plaintiffs to include the false statements in the counts alleging them, rather than simply incorporating entire conversations by reference. *Appleton*, 2001 WL 45473, at *3; *Hercules*, 613 A.2d at 923. The court also directs the plaintiffs to include in the relevant counts the facts that directly support the remaining elements of fraud or negligent misrepresentation. *Id.*

## IV. CONCLUSION

For the foregoing reasons, the court grants in part and denies in part the motions to dismiss of defendants USOP, Ledecky, and Claypoole. The court rules that Count I adequately states a claim against defendant USOP. The court further determines that the plaintiffs failed to state a claim upon which relief may be granted for Counts II–V, VIII–XII, XVI, XVIII, XIX, and XX and consequently, the court dismisses these counts. The court also determines that Counts XIV and XV fail to adequately plead fraud or negligent misrepresentation by defendants USOP, Ledecky, and Claypoole and thus the court dismisses these counts without prejudice. Accordingly, the plaintiffs may file an amended complaint within 60 days of the

---

**19.** The defendants demonstrate that Count XIV and XV incorporate by reference multiple statements from several conversations without specifying which are relevant. Mot. to Dismiss (USOP) at 36; Mot. to Dismiss (Claypoole) at 9–10. This is significant because many of the statements are simply not actionable as plead. *Kowal*, 16 F.3d at 1278. For example, defendant Claypoole argues that the few statements the plaintiffs allege he made related to the February 11 meeting are not false and do not omit material facts. Reply (Claypoole) at 5–6. The statements that simply demonstrate actions or requests, such as Mr. Ledecky's statement urging the plaintiffs to refrain from selling stock and Mr. Clay-

poole's agreement to accept a memorandum summarizing the discussion on February 11, fail to allege misrepresentations. Compl. ¶¶ 55, 57; *Appleton*, 2001 WL 45473, at *3; *Kozy Korner*, 672 A.2d at 1066. No reasonable inference supports the falsity of these statements. *Id.* Additional representations that the plaintiffs allege, such as defendant Ledecky's optimistic predictions of the future value of USOP stock, are also not actionable as plead. *Id.* ¶ 55; Mot. to Dismiss (USOP) at 36; *Kowal*, 16 F.3d at 1278 (stating that a plaintiff claiming that statements of optimism are false must demonstrate that the defendant lacked a reasonable basis for its projections or issued them in less than good faith).

date of this opinion. Finally, the court notes that the plaintiffs have asserted that they will withdraw Counts VI, VII, XIII, and XVII in their entirety; Counts II–V and VIII as against defendant Ledecky; and Count XX as against defendant Claypoole. The plaintiffs shall file the withdrawal within 10 days of the date of this opinion, otherwise the court will deem these claims automatically dismissed. An order directing the parties in a manner consistent with this Memorandum Opinion is separately and contemporaneously issued this 4th day of March, 2003.